STATE OF NORTH CAROLINA v. LILA WILLIAMS

No. 8215SC1

(Filed 5 October 1982)

**1. Criminal Law § 75.14— motion to suppress incriminating custodial statements improperly denied—mental and physical impairment of defendant—failure to demonstrate knowing and intelligent waiver**

In a prosecution for murder where defendant was 57 years old, mildly to moderately mentally retarded, suffering from permanent brain damage, diabetes, high blood pressure and heart disease, the trial court erred in denying defendant's motion to suppress incriminating custodial statements made by defendant on the night of her arrest since the State failed to meet its burden of affirmatively demonstrating a knowing and intelligent waiver by defendant and since the court's conclusion that defendant "understandingly" waived her *Miranda* rights was not supported by findings of fact.

**2. Criminal Law § 75.12— error in admission of custodial statements—prejudicial**

It was prejudicial error to deny defendant's motion to suppress certain custodial statements since they were evidence that defendant was motivated to shoot the decedent by an argument and that defendant was not acting in self defense whereas the only untainted evidence against defendant consisted of her statements to a neighbor and to an officer from which a jury might reasonably infer that the shooting was not intentional.

APPEAL by defendant from *McLelland, Judge.* Judgment entered 25 March 1981 in Superior Court, ALAMANCE County. Heard in the Court of Appeals 31 August 1982.

Defendant was indicted for the first degree murder of James Edward Johnson. Defendant is 57 years old, mildly to moderately mentally retarded, suffering from permanent brain damage, diabetes, high blood pressure and heart disease. Although defendant is marginally able to care for herself, defendant's impairments result in an inability to effectively communicate, periodic confusion, disorientation, and lapses in memory. Defendant moved to suppress incriminating custodial statements made the night of her arrest. Her motion was denied and she was tried for second degree murder, the State offering her custodial statements against her. The jury returned a verdict of guilty of voluntary manslaughter and judgment imposing a sentence of imprisonment was entered. Defendant appealed.

*Attorney General Rufus L. Edmisten, by Assistant Attorney General Sarah C. Young, for the State.*

*Appellate Defender Adam Stein, by Assistant Appellate Defender Nora B. Henry, for defendant-appellant.*

WELLS, Judge.

Defendant contends that the trial court erred in refusing to suppress her custodial statements. The evidence presented at the hearing showed that on the night of 22 July 1980, defendant sought the aid of her neighbor, Sherry Jane Thaxton. Defendant awoke Thaxton and told her that she had shot her boyfriend, Johnson. Thaxton alerted the police and accompanied defendant to the house where defendant and Johnson lived. Officer Dale Allen arrived at the scene and found Johnson lying on his bed, shot in the chest. Allen asked defendant what had happened. She responded, "I shot him. There's the gun, take it."

Defendant, accompanied by Thaxton, was transported to the Burlington Police Department. Defendant was given her *Miranda* warnings, signed a waiver of rights form, and answered the questions of Detective J. V. Barbee. Ms. Thaxton was present at the interrogation and was allowed to answer some background questions for defendant. Detective Barbee conducted the interview. Barbee was gentle with defendant, leading her along, asking her questions which could be easily answered. When Barbee asked defendant if she understood her rights, twice she was unresponsive to his question. The third time, defendant said she "reckoned" that she understood everything. When Barbee asked defendant to sign the rights form indicating she had been given her rights, she started writing her initials, but when he told her that she could sign with a mark if she could not write, defendant scratched out her initials and put an "X" as her signature. When defendant signed the waiver form for Barbee she signed with her initials.

Defendant cooperated with Barbee. She repeatedly told him that she was nervous and that she neither knew nor could remember what had happened. Her statement, which was in evidence at the suppression hearing, contains the following dialogue:

. . .

BARBEE: Well, what we need to know, Mrs. Williams, is what happened over there tonight, and you are the only one here that can tell us.

WILLIAMS: I don't know, but I didn't look 'til I shot him. I'll say it like that.

BARBEE: Do you remember shooting him?

WILLIAMS: I shot him, but I didn't know, I said what happened. And he was laying there on the bed.

. . .

BARBEE: Was he setting up on the bed when you shot him?

WILLIAMS: He was on the bed when I shot him. I'd say it like that.

BARBEE: And he fell over?

WILLIAMS: Uh-hu. I said "Lorda mercy" and I went and got me a girl to call an ambulance.

BARBEE: That girl, you mean Sherry Thaxton?

WILLIAMS: That's right. And I said "I shot him". I said "I don't know what happened". Sure did.

. . .

BARBEE: Let me ask you this. Were you all arguing? Was there some?

WILLIAMS: No. I say, I went to the bathroom, come back, but I didn't see him and I went to lay down on the chair. And then I see him go to his room and that was it. And I don't know nothing else.

. . .

BARBEE: Okay. You were setting in the living room then when he came in to go to the bedroom, is that right?

WILLIAMS: Uh-hu.

BARBEE: Did he say anything to you, do you remember?

WILLIAMS: No. A little bit. Not too much. He wasn't arguing too much.

. . .

BARBEE: He must have said something to you to make you mad.

WILLIAMS: He was right quiet and nothing after I did that. Said something.

BARBEE: You remember shooting him, right?

WILLIAMS: Yeah, I sure did it.

BARBEE: You don't remember anything right before you shot him?

WILLIAMS: I said I'm sorry, I'm sorry. And then I went over and got the gun. Sure did.

BARBEE: Did he say anything to you after you shot him?

WILLIAMS: Now, you know, how people do in arguing.

. . .

BARBEE: So, well, really don't know what the argument was about.

WILLIAMS: I don't know. I said . . .

THAXTON: He wants to know what you all had to argue about.

WILLIAMS: I don't know. Like I said, I get ------- a minute and that was it. I get nervous and upset and . . .

BARBEE: Just got mad.

BROWNING: What did you get nervous and upset about?

WILLIAMS: I don't know. I don't like to argue. Say it like that.

BARBEE: What were you arguing about, that's what we need to know.

WILLIAMS: Well, I say it like this here, I don't know. I say it like that.

BARBEE: Well, let me ask you this . . .

WILLIAMS: I get hot and he gets hot too. But you know I'm just nothing but me. And he ain't never what he is.

BARBEE: Well, just before you shot him, was he going to hurt you or?

WILLIAMS: Hu-hu-hu.

BARBEE: He didn't try to hurt you?

WILLIAMS: Hu-hu. Hu-hu. Sure didn't. Everybody know I did it.

BARBEE: He didn't have a weapon or anything did he?

WILLIAMS: Hu-hu. Sure didn't. That was it.

BARBEE: Well. Did you think about shooting him before you went and got the gun and shot him?

WILLIAMS: Hu-hu. Sure didn't.

BARBEE: Didn't think about?

WILLIAMS: If I did . . . hu-hu, ain't going to think about nothing like that.

BARBEE: I know, but can you remember what you were thinking then? Can you remember whether or not you was thinking about going and getting the gun?

WILLIAMS: I don't know, I say it like that. I just, I don't know. I'm just nervous, like I said, I'm just, get hot and I'm just what I am, you know. When that happens, in a minute, that's it. Say it like me. I ain't never shot nobody before then.

. . .

BARBEE: Did he want to argue with you? Tonight?

WILLIAMS: He just, you know, he would start, and he put his pants on everything, pajamas, I say it like that. And I don't know, a thing like that, looked like I got worried and got crazy, I say it like that.

BARBEE: Did you really have a reason for shooting him?

WILLIAMS: No. Nope, sure didn't.

BARBEE: Did the idea just pop in your head?

WILLIAMS: I don't know what happened, sure don't.

BROWNING: Was the gun loaded?

WILLIAMS: I don't know either.

. . . .

Defendant's mental and physical condition was the subject of extensive testimony. Dr. Shelley Earp testified that she had been treating defendant since 1975 and knew defendant reasonably well. Dr. Earp's first contact with defendant was at a time when defendant was in intensive care due to kidney infection, complications with diabetes resulting in cardiac arrest, and severe pneumonia. After release from the hospital, defendant continued to see Dr. Earp for treatment of her diabetes. Dr. Earp testified that she knew that defendant already had permanent brain damage as a result of injuries sustained in an auto accident. She believed that defendant's mental capacity was further impaired by her 1975 cardiac arrest. Dr. Earp testified that although defendant can carry on a conversation, her brain damage is manifested by speech-related impairments and poor memory. In prescribing diabetic treatment for defendant, Dr. Earp relied on information from third persons because defendant was unable to give reliable information. Dr. Earp does not allow defendant to administer her own insulin but sends instructions to a neighbor of defendant's to assure that defendant receives her prescribed treatment. Having heard Detective Barbee testify as to his explaining to defendant her *Miranda* rights, Dr. Earp was of the opinion that defendant could only understand those rights if "extraordinary care" and "a tremendous amount of time" were given defendant in a supportive atmosphere. It was Dr. Earp's opinion that defendant did not understand her rights when she made the statement to Barbee.

Dr. Martha Wingfield, a neurologist, testified that she examined defendant at Dix Hospital following her arrest. Defendant was not able to tell Dr. Wingfield her medical history. Although defendant was generally oriented as to her physical environment,

she did not know why she was at Dix Hospital. Dr. Wingfield found that defendant had difficulty in performing in response to two-part commands, and she was of the opinion that defendant's brain damage resulted in impaired ability to make judgments and inability to handle pressure. It was Dr. Wingfield's opinion that defendant was not able to understand her *Miranda* rights as they were given to her.

Dr. Joseph Moylan, a neuropsychologist, gave defendant a battery of tests at Dr. Wingfield's request. Dr. Moylan testified that defendant had an I.Q. of 56, that her reading ability was below third grade level, that her memory was poor and that defendant was weak in ability to respond to questions. He was of the opinion that defendant could not comprehend her rights as they are explained in the *Miranda* form.

Dr. Billy Royal, a forensic psychiatrist, saw defendant periodically for six weeks for the purpose of evaluating her competence to stand trial. Dr. Royal found defendant to be suffering from hypertension and chronic brain syndrome, or permanent brain damage. He testified that defendant's chronic brain syndrome results in confusion, speech and comprehension impairment and stilted, repetitive responses to questions. He further testified that older people with chronic brain syndrome experience confusion, disorientation and lapses in memory at night. He found that defendant had little memory of the day of her arrest, and that she had no memory of the police interrogation or of any *Miranda*-type material, except that she remembered being fingerprinted. Dr. Royal explained that defendant's condition was a product of brain damage, not mental illness. He believed defendant to be "borderline" competent to stand trial if given the proper attention, care, and time. Dr. Royal was of the opinion that, although she could distinguish right from wrong at the times he interviewed her, defendant did not know right from wrong the night of the shooting.

Detective Barbee testified that defendant expressed concern about her medication during her interrogation, but that she could not remember when she had last received it. Barbee stated that he found some of defendant's answers to be unresponsive and that at times during his interview with defendant he became convinced that she was acting without understanding the consequences of her cooperation.

The trial judge made findings of fact which included the following:

6.   Defendant is a fifty-seven (57) years (sic) old black female who, despite having a ninth-grade education, now has an intelligence quotient of fifty-six (56), and the ability to read at slightly below third-grade level.

7.   Defendant suffers from diabetes, hypertension, and chronic brain syndrome. She is not and has not been mentally ill. In 1969 she was hospitalized when blood pressure reached 240 over 140. She was again hospitalized in 1971 following an auto accident, when she suffered subdural hematoma and her cranial arch was surgically opened to relieve pressure on her brain. She was again hospitalized in 1975 when she suffered cardiac arrest.

8.   The left frontal lobe of Defendant's brain is damaged in consequence of the infirmities described in 7. above, and her ability to comprehend language, to remember, to reason, and to react appropriately are substantially limited. She requires some constant supervision, but is ordinarily oriented as to time and circumstances, and, when allowance is made for her limitations, is able to understand the nature and object of the criminal proceeding in this case, to understand her own involvement, and to assist counsel in her defense.

9.   Defendant lacks the mental capacity fully to understand her Constitutional Rights as set forth in the form admitted as State's Exhibit No. 1, or fully to appreciate the consequences of a waiver of such rights. Her right to refuse to make a statement is within her capacity to comprehend. After being advised of her right to remain silent and the other rights shown in State's Exhibit No. 1, she understood that she had the right to remain silent, and she freely and voluntarily chose to make a statement. Viewed in their totality, the circumstances under which the Defendant was interrogated were not oppressive or coercive.

Based on its findings of fact, the court concluded that defendant's statement " . . . was made freely, voluntarily, and understandingly, and is admissible in evidence against her, and the motion to suppress should be denied."

[1]   As a general rule, findings of fact on *voir dire* based on competent evidence are conclusive on appeal. *State v. Biggs,* 289 N.C. 522, 223 S.E. 2d 371 (1976); *State v. Curry,* 288 N.C. 660, 220 S.E. 2d 545 (1975); *State v. Stepney,* 280 N.C. 306, 185 S.E. 2d 844 (1972). Conclusions of law made by a trial court are always reviewable in the appellate courts. *State v. Bishop,* 272 N.C. 283, 158 S.E. 2d 511 (1968); *State v. Conyers,* 267 N.C. 618, 148 S.E. 2d 569 (1966). In the case at hand, the conclusion reached by the trial court that defendant "understandingly" waived her *Miranda* rights is not supported by findings of fact. In fact, the pertinent finding states that " . . . [d]efendant lacks the mental capacity . . . fully to appreciate the consequences of a waiver of such rights." The court's finding that " . . . she understood that she had a right to remain silent, and she freely and voluntarily chose to make a statement" establishes only that the court found that defendant's waiver was free and voluntary, not that it was a knowing one.

In *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694 (1966), the United States Supreme Court held that for a statement of a defendant which is the product of an uncounseled custodial interrogation to be offered as evidence against the defendant at trial the State must first meet a heavy burden of demonstrating that the defendant knowingly and intelligently waived his rights to remain silent and to have an attorney present. Our courts have consistently applied the rule that in relinquishing these Fifth and Sixth Amendment rights the defendant must do so voluntarily, with an understanding of the potential consequences of talking. *See State v. White,* 291 N.C. 118, 229 S.E. 2d 152 (1976); *State v. Pruitt,* 286 N.C. 442, 212 S.E. 2d 92 (1975).

In *Davis v. North Carolina,* 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed. 2d 895 (1966), decided one week after *Miranda,* the United States Supreme Court reiterated the rule that the question of voluntariness must be answered after an examination of a totality of the circumstances reflected in the record. *See also Blackburn v. Alabama,* 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed. 2d 242 (1960); *Fikes v. Alabama,* 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed. 2d 246 (1957). In adherence to the *Davis* rule, we must consider the entire record in reviewing the trial court's decision concerning defendant's volition and understanding in waiving her constitutionally protected

rights. *See State v. Pruitt*, supra; *State v. McCloud*, 276 N.C. 518, 173 S.E. 2d 753 (1970); *State v. Spence*, 36 N.C. App. 627, 244 S.E. 2d 442, *disc. rev. denied*, 295 N.C. 556, 248 S.E. 2d 734 (1978).

In *State v. Ross*, 297 N.C. 137, 254 S.E. 2d 10 (1979), the evidence showed that defendant had a history of mental illness and that he "looked" and acted strange around the time of his confession. The interrogating officer testified that defendant appeared to be comfortable and answered questions logically. Upon reviewing the entire record, our Supreme Court reversed defendant's conviction because "in all probability" defendant was mentally incompetent at the time of his confession.

*State v. Spence*, supra, involved facts similar to the present case. In *Spence*, defendant was mentally retarded, and his police interviewer concluded that defendant did not fully understand his *Miranda* rights in spite of the fact that he had signed the waiver of rights form. This Court granted defendant a new trial based on its holding that no knowing and intelligent waiver had been shown.

Upon reviewing the evidence before the court on the motion to suppress, we hold that the State failed to meet its heavy burden to affirmatively demonstrate a knowing and intelligent waiver by defendant. To deny defendant's motion to suppress was error.

[2] The State contends that if it was error to deny defendant's motion to suppress, such error was harmless because defendant made other voluntary statements describing the shooting. "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed. 2d 705 (1967). In *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed. 2d 284 (1969), the Supreme Court found admission of defendant's unconstitutionally obtained confession to be harmless error. In *Harrington*, the Court held that since the record contained "overwhelming" untainted evidence to support the conviction, the *Chapman* rule should not result in a new trial.

North Carolina courts followed the *Chapman* rule. *See State v. Cox, State v. Ward* and *State v. Gary*, 281 N.C. 275, 188 S.E. 2d

356 (1972) (harmless error beyond a reasonable doubt to admit tainted confession because of a mass of untainted evidence of guilt); *State v. Brinson*, 277 N.C. 286, 177 S.E. 2d 398 (1970) (harmless error to admit co-defendant's confession where other evidence against defendant was overwhelming). In 1977 the General Assembly codified the rule by enacting G.S. 15A-1443(b) as follows:

> A violation of the defendant's rights under the Constitution of the United States is prejudicial unless the appellate court finds that it was harmless beyond a reasonable doubt. The burden is upon the State to demonstrate, beyond a reasonable doubt, that the error was harmless.

In the present case, the only untainted evidence against defendant consists of her statements to Ms. Thaxton and Officer Allen that she shot the decedent. Taken in light of the surrounding circumstances, a jury might reasonably infer from these statements that the shooting was not intentional. The custodial statement of defendant is evidence that defendant was motivated to shoot the decedent by an argument and that defendant was not acting in self defense. On the facts of this case, we cannot say that the error in admitting defendant's custodial statements as evidence of guilt was harmless beyond a reasonable doubt.

Additionally, we note that the trial court made no findings of fact concerning defendant's waiver of her right to counsel. The Supreme Court, in *State v. Biggs*, supra, held that where *voir dire* evidence regarding waiver of counsel is in conflict, the trial judge *must* resolve the dispute and make an express finding as to whether the defendant knowingly and intelligently waived his right to have counsel present during questioning. In the present case, it was error to fail to make such a finding.

For the court's error in admitting defendant's custodial statements, defendant must have a

New trial.

Judges HEDRICK and ARNOLD concur.