STATE OF NORTH CAROLINA v. STEVEN DANIEL FISHER, Defendant

No. COA01-1504

(Filed 3 June 2003)

**1. Confessions and Incriminating Statements— motion to suppress—written findings of fact and conclusions of law**

The trial court did not err in a first-degree murder case by denying defendant's motion to suppress his statement to officers without first making and entering findings of fact and conclusions of law in the record, because: N.C.G.S. § 15A-977(d) does not require findings to be made in writing at the time of the ruling, and effective appellate review is not precluded by an order entered later when the trial court announces its ruling in open court on a motion to suppress and later files its written order with findings of fact and conclusions of law.

**2. Confessions and Incriminating Statements— motion to suppress—custodial interrogation**

The trial court did not err in a first-degree murder case by denying defendant's motion to suppress his statement to an officer on 16 July 1999 after defendant invoked his right to counsel, because the officer's conduct did not constitute an interrogation when: (1) there was nothing to suggest the officer's words and conduct were intended to accomplish anything other than to honor defendant's rights; (2) nothing in the record suggested any knowledge on the part of the officer concerning any unusual susceptibility by defendant to any particular form of persuasion; and (3) it cannot be said that the officer should have known his conduct was reasonably likely to elicit an incriminating response from defendant.

**3. Confessions and Incriminating Statements— motion to suppress—finding of fact—reinstatement of communication after invoking right to counsel**

The trial court did not err in a first-degree murder case by denying defendant's motion to suppress his statement to officers even though the trial court failed to make a specific finding of fact as to who reinitiated the communication between defendant and the officers after defendant invoked his right to counsel, because: (1) the factual evidence presented during voir dire was uncontroverted; and (2) the fact that defendant initiated further

contact with the officers may be implied from the facts found by the trial court.

**4. Confessions and Incriminating Statements— motion to suppress—failure to give Miranda warnings—inmate**

The trial court did not err in a first-degree murder case by denying defendant's motion to suppress his statement to a jail sergeant given without Miranda warnings while defendant was an inmate, because: (1) defendant was at all times free not to talk and return to his cell, and defendant exercised both of these rights at different points during the interview; (2) defendant initiated the meeting with the sergeant; (3) defendant's presence was not required, and at no time was defendant physically restrained from leaving the sergeant's office; and (4) defendant was thus not in custody for purposes of Miranda.

**5. Constitutional Law— right to remain silent—custody**

Although defendant contends the trial court erred in a first-degree murder case by concluding that a jail sergeant was not required to terminate her interrogation of defendant once defendant invoked his right to remain silent, defendant was not in custody for purposes of Miranda and the sergeant was not prohibited from inquiring into the motivation behind defendant's sudden change of heart regarding the fact that he had previously stated he wanted to make a confession to the pertinent crime and then changed his mind.

**6. Confessions and Incriminating Statements— motion to suppress—failure to give Miranda warnings**

The trial court did not err in a first-degree murder case by denying defendant inmate's motion to suppress his statement to an officer on 14 July 1999 even though defendant did not receive any Miranda warnings prior to the officer interviewing him, because: (1) Miranda warnings are only required when a criminal defendant is subjected to custodial interrogation; and (2) defendant was not in custody when he asked to speak with the officer, remained at all times free to terminate the conversation with the officer, and in fact did so once he was told that another officer would take his statement the following day.

**7. Confessions and Incriminating Statements— motion to suppress—mental capacity**

The trial court did not err in a first-degree murder case by denying defendant inmate's motion to suppress his state-

**STATE v. FISHER**

[158 N.C. App. 133 (2003)]

ments to an officer and a jail sergeant without first making specific findings and conclusions concerning defendant's mental capacity, because: (1) admissibility of defendant's statements to these officers was not dependent upon the validity of any waiver of his Miranda rights when neither individual was required to give defendant his Miranda warnings; and (2) although the evidence raised a serious question as to defendant's mental capacity on 14 and 15 July 1999 and specific findings on the issue of defendant's competency at the time he confessed were a prerequisite to the admission of defendant's statements, the error in not making the findings was harmless beyond a reasonable doubt when, even in the absence of defendant's two previous confessions, defendant's 16 July confession comprehensively outlined all of the events and details that had theretofore been provided and the evidence failed to indisputably establish the strongest possibility that defendant was insane and incompetent at the time of his confession.

**8. Sentencing— concurrent sentence—life sentence**

The trial court did not err in a first-degree murder case by entering a written finding which failed to reflect that defendant's life sentence was to run concurrently with the sentence defendant was already serving which was a term in defendant's plea agreement, because: (1) unless a statute requires the sentences to run consecutively or the trial court's judgment specifies that the sentences shall run consecutively in the judgment, the sentences must, as a matter of law, run concurrently; and (2) defendant was convicted and sentenced for violating N.C.G.S. § 14-17, which has no provision requiring that the sentences imposed under that statute run consecutively with any other undischarged sentence.

**9. Homicide— first-degree murder—short-form indictment— constitutionality**

The short-form indictment used to charge defendant with first-degree murder was constitutional and complied with the requirements of N.C.G.S. § 15-144.

Judge GEER dissenting.

Appeal by defendant from judgment entered 13 August 2001 by Judge Wiley F. Bowen in Harnett County Superior Court. Heard in the Court of Appeals 10 February 2003.

**STATE v. FISHER**

[158 N.C. App. 133 (2003)]

*Attorney General Roy Cooper, by Special Deputy Attorney General H. Alan Pell and Special Deputy Attorney General Jonathan P. Babb, for the State.*

*Paul M. Green for defendant-appellant.*

EAGLES, Chief Judge.

Defendant Steven Daniel Fisher appeals from judgment entered in Harnett County Superior Court upon a plea of guilty to the first-degree murder of Wanda Renee James.

The State's evidence tends to establish the following: Defendant first met Wanda Renee James ("James") in June 1995. Defendant was living in Virginia at the time, while James lived in Erwin, North Carolina. Shortly after their first meeting, defendant became romantically involved with James and began driving to Erwin on weekends to stay with James. Sometime during August or September of 1995, defendant quit his job in Virginia and moved in with James at her residence in Erwin. Defendant's romantic relationship with James continued until February 1996, when defendant arrived home from work early one day and discovered James in a state of undress in bed with her ex-boyfriend, Jerry Holder. Defendant was arrested following a brief physical altercation between him and Holder. After his release on bail, defendant returned to Portsmouth, Virginia.

On Friday, 1 March 1996, defendant returned to North Carolina to surrender himself to the bail-bondsmen who had secured his release in February. After being told he could not appear before the court until Monday, 4 March 1996, defendant went to stay with his former employer, Donnie Jacobs, in Godwin, North Carolina. On Saturday, 2 March 1996, after drinking beer and smoking marijuana over a period of approximately six hours, defendant decided to go see James. Defendant fabricated a story about why he was leaving and walked from Jacobs' house to James' house, arriving at James' house sometime between 2:00 a.m. and 3:00 a.m. on 3 March 1996.

Upon his arrival at James' house, defendant noticed that a pickup truck was parked in the yard beside James' car. Defendant entered the house through a side door he knew James always left unlocked and went into James' bedroom. Defendant found James and Holder lying beside each other across the bed. James and Holder were both fully clothed and the smell of alcohol permeated the room. Angry at seeing James and Holder in bed together again, defendant slipped James' bathrobe belt around James' throat and strangled her.

Defendant then went into the kitchen where he poured himself a glass of water, sat down at the kitchen table, drank the water and smoked a cigarette. Defendant remained in the house for approximately 45 minutes to an hour, however, Holder was never alerted to defendant's presence. Defendant left through the same door he entered, taking the glass and bathrobe belt with him, being careful not to touch anything else in the house. Defendant then walked back to Jacobs' house along the same route he had traveled on earlier, disposing of the glass and belt in a ditch along the side of the road. Defendant arrived back at Jacobs' house at approximately 6:30 a.m. on Sunday, 3 March 1996. Holder awoke later, found James dead in the bed, and immediately called police.

Lieutenant Henry Hairr ("Hairr"), of the Erwin, North Carolina Police Department, investigated James' death. Hairr initially noted that there were no signs of forced entry into the home. Hairr testified that he found James' body lying face-down, "crossways" on the bed in the first bedroom on the right as he walked down the hallway of the house. James was wearing a blue turtle neck sweater and a necklace. Hairr noted that the necklace had left an impression on James' neck, just above the top of the neck of the sweater. Also present, were hemorrhages in the whites of James' eyes, which Hairr testified he thought were consistent with strangulation. Hairr noticed that there were two opened packs of cigarettes, one Marlboro and one Winston, lying on the kitchen table. Holder told Hairr the Marlboro cigarettes belonged to him and the Winston cigarettes were James'. Holder further stated that he and James had gone to the C and G Club in Lillington the night before and that he had been drinking heavily that night. Holder said he had no recollection of anything that occurred from the time he and James left the club until he woke up Sunday morning.

From March 1996 until July 1999, defendant told no one about his role in James' death. The initial autopsy report indicated the cause of James' death was "undetermined, [but] associated with a pulmonary congestion and edema and pneumococcus pneumonia," with "underlying factors of alcohol and . . . narcotics." No charges were filed at the time in connection with James' death.

On 14 July 1999, while incarcerated in the Hampton Roads Regional Jail in Portsmouth, Virginia, defendant motioned for the jail officer in charge of his cell-block to let him out of his cell. The POD Manager, Officer Mark A. C. Glover ("Glover"), electronically opened the door to defendant's cell and allowed defendant to walk down-

stairs to the control pod where Glover was working. Defendant asked to speak to Glover in private, so Glover opened the pod door, allowing defendant to "come around and talk . . . in private."

Defendant told Glover that "[he] would like to confess a crime [he] committed because it [wa]s tearing [him] up inside." Defendant waited while Glover contacted his watch commander, Lieutenant Riggans, and relayed what defendant said. Riggans instructed Glover to ascertain whether the confession related to a current or past offense, as well as some basic factual information about the offense and call her back. When Glover asked defendant whether he was confessing to "his current crime or a prior crime," defendant responded by telling Glover that he "murdered a woman on March 3, 1996 in Erwin, North Carolina." Defendant said that once he "realized [he] was getting away with murder it started eating [him] up inside," so he felt he had to tell someone in order to "get this behind [him]." Glover was unable to reach Riggans when he called her back, so Glover relayed the information to Sergeant Edwards. Edwards told Glover that Sergeant Wilkins from internal affairs would take defendant's statement, but would not be available until the following day. Glover relayed this information to defendant, who remarked: "I hope they will come soon, I don't know how long I can take this." Defendant thanked Glover for listening to him and keeping the information confidential and returned to his cell.

On 15 July 1995, at approximately 8:45 a.m., a jail officer escorted defendant to Sergeant Angela Wilkins' office in the Hampton Roads Regional Jail. Once there, the officer waited outside Wilkins' door so that only defendant and Wilkins were present during the interview. Defendant was neither handcuffed nor restrained at any point either before, during or after the interview. The following colloquy took place between defendant and Wilkins:

Sgt:    Mr. Fisher, I got word yesterday, which was July 14th, from Sgt. Edwards that you had some information about a murder. And the details that I got was that there was a murder took place, and that it took place in North Carolina. And you wanted to give information in reference to that. Is that what you want to do today?

Fisher: I don't think, I don't want to, I ain't gonna do nothing. I ain't gonna say nothing.

Sgt:    Okay, you don't want to make a statement or anything?

Fisher: No.

Sgt:    Okay, why'd you change your mind?

Fisher: I don't know.

Sgt:    Okay, is it that you [sic] conscience is bothering you, the reason why you wanted to do this in the beginning? Or, is there, did anybody force you to say you wanted to make this statement? Or is this on your own free will?

Fisher: Alright, I'll tell you what happened. Do you want me to start from the beginning?

Sgt:    Wherever you want to start it. Wherever you feel comfortable with it.

Fisher: Okay, on March 2, 1996, I was in North Carolina. I was in Cumberland County staying at my boss's house, and uh, I had been drinking and I uh, went to sleep. And I woke up about 12:00 a.m. And I walked from Cumberland County to Irwin. And I went in the side door, which is the kitchen door, of Wanda Renee James' house. The door was unlocked. I went in there, went into the bedroom. Her and this guy named Jerry were laying across the bed, uh, sideways, not, not head to toe, but across the bed. And, uh, I could tell that they had been drinking because I could smell it and they were both passed out. I reached in the uh, closet and got a bathrobe tie. And wrapped it around Wanda Renee James' neck and strangled her until she stopped breathing. And then I left and took the tie with me and uh, went back to my boss's house in Cumberland County and uh, that's pretty much it. She had on a blue turtle neck sweater, blue jeans and some brown shoes. I didn't do nothing to the guy Jerry. He didn't wake up, he didn't move, I didn't make no noise.

The interview ended at approximately 8:55 a.m. and defendant was returned to his housing unit.

Later that same morning, at approximately 11:25 a.m., defendant again attracted the attention of a jail officer by beating on his cell door and pointing at his wrist. After being let out of his cell, defendant told the officer that he had just "confessed to a murder and . . . need[ed] some help before [he] kill[ed him]self." Defendant told the officer that he had cut his wrist before and was currently "trying to

cut it again with [his] toothpaste container." Defendant also said he was "looking for other objects" with which to cut himself. Although defendant required no medical attention, he was subsequently placed on suicide watch pending further evaluation.

On 16 July 1999, defendant was interviewed by Special Agent Michael B. East ("East") of the North Carolina State Bureau of Investigation ("SBI") in the presence of Detective Hairr of the Erwin Police Department, Sergeant Wilkins of the Hampton Roads Regional Jail and Detective Turner of the Portsmouth Police Department. Before beginning the interview, Agent East informed defendant of his constitutional rights by reading them directly from a standard SBI waiver form. Defendant verbally indicated that he understood each individual right after it was read to him by East. After East read defendant his rights, he then read the waiver portion of the form to defendant. Defendant read along with East and at the end of the waiver, defendant indicated that he did not wish to sign the form. When East inquired as to the reason, defendant stated that "he wanted to talk to an attorney."

East made a notation below the signature line of the form which said: "refused to sign, 3:15 p.m." East then asked defendant if he "kn[e]w the name of his attorney . . . ." When defendant responded negatively, East told defendant that they "couldn't question him any more about it since he had requested to speak with an attorney." East then laid the waiver form and pen down on the table in front of him, reached into his pocket and removed a business card. East handed his card to defendant and told him that "after he talked to an attorney, if he still wanted to talk about this incident, either he or his attorney could contact [him] at the number on the business card." East then pointed in the direction of Detective Hairr and said "he and I are going back to Erwin . . . ." When Detective Hairr stood up and began walking toward the door, defendant "grabbed" the waiver form and pen from the desk and said "[a]ll right, I'll sign it." Defendant signed the waiver and initialed the notation of refusal East had made earlier on the form.

Thereafter defendant gave a complete account of his involvement in the death of Wanda Renee James, recounting the events exactly as he had to Sgt. Wilkins. In addition, defendant described how he had wrapped the belt around the turtle neck portion of James' sweater, which prevented the belt from touching her neck and twisted it until James stopped breathing. Defendant also provided

a detailed description of the crime scene, including accurate accounts of: (1) the position of James' body on the bed; (2) the clothes that both James and Holder were wearing that morning; (3) the position of the cigarettes on the kitchen table and that there were both Marlboro and Winston cigarettes; and (4) which lights were and were not on in the house.

On 30 August 1999, defendant was indicted for the first-degree murder of Wanda Renee James. Defendant moved pursuant to N.C. Gen. Stat. § 15A-974 to suppress all statements made by him to law enforcement officers on grounds that the statements were obtained in violation of the Fifth Amendment to the United States Constitution. On 8 August 2001, following an evidentiary hearing, the trial court denied defendant's motion to suppress per G.S. 15A-979(b). On 13 August 2001, defendant entered a plea of guilty, pursuant to a negotiated plea agreement expressly reserving his right to appeal the denial of his motion to suppress. The trial court entered judgment on defendant's plea of guilty and sentenced defendant to life in prison without possibility of parole. Defendant appeals.

*I.*

[1] Defendant first contends the trial court erred by denying his motion to suppress without first making and entering findings of fact and conclusions of law in the record. Defendant argues that N.C. Gen. Stat. § 15A-977(d) requires that findings of fact be made before any determination on the issue of suppression. We disagree.

G.S. 15A-977 provides that when a suppression hearing is held, "[t]he judge must set forth in the record his findings of facts and conclusions of law." N.C. Gen. Stat. § 15A-977(f) (1999). "Findings and conclusions are required in order that there may be a meaningful appellate review of the decision. [However, t]he statute does not require that the findings be made in writing at the time of the ruling." *State v. Horner*, 310 N.C. 274, 279, 311 S.E.2d 281, 285 (1984). Effective appellate review is not precluded by an order being entered later when "the trial judge announce[s] his ruling in open court on a motion to suppress and later file[s] his written order with findings of fact and conclusions of law." *Id.*

Here, following a suppression hearing, the trial judge announced his ruling in open court. The trial judge later filed a written order setting forth his findings of fact and conclusions of law. Accordingly, we conclude this assignment of error is without merit.

STATE v. FISHER

[158 N.C. App. 133 (2003)]

## II.

[2] Defendant next contends the trial court erred by failing to suppress the statement he made to Agent East on 16 July 1999. Defendant argues that his statement was inadmissible because Agent East continued to interrogate him after he invoked his right to counsel in violation of *Edwards v. Arizona*, 451 U.S. 477, 68 L. Ed. 2d 378 (1981). We disagree.

We begin by noting that " 'the standard of review in evaluating a trial court's ruling on a motion to suppress is that the trial court's findings of fact 'are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting.' ' " *State v. Johnston*, 154 N.C. App. 500, 502, 572 S.E.2d 438, 440 (2002) (citations omitted). However, because "[t]he determination of whether an interrogation is conducted while a person is in custody involves reaching a conclusion of law," this question is fully reviewable on appeal. *State v. Greene*, 332 N.C. 565, 577, 422 S.E.2d 730, 737 (1992).

Once an accused invokes his right to counsel during a custodial interrogation, "the interrogation must cease and cannot be resumed without an attorney being present *'unless the accused himself initiates further communication, exchanges, or conversations with the police.'* " *State v. Golphin*, 352 N.C. 364, 406, 533 S.E.2d 168, 199 (2000) (quoting *Edwards v. Arizona*, 451 U.S. 477, 485, 68 L. Ed. 2d 378, 386 (1981)), *cert. denied*, 532 U.S. 931, 149 L. Ed. 2d 305 (2001). However, not every statement obtained by police from a person in custody is considered the product of interrogation. *Rhode Island v. Innis*, 446 U.S. 291, 299, 64 L. Ed. 2d 297, 307 (1980). Interrogation is defined as either "express questioning by law enforcement officers," *Golphin*, 352 N.C. at 406, 533 S.E.2d at 199, or conduct on the part of law enforcement officers which constitutes the "functional equivalent" of express questioning. *Innis*, 446 U.S. at 301, 64 L. Ed. 2d at 308. The latter is satisfied by "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* "However, because 'the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.' " *Golphin*, 352 N.C. at 406, 533 S.E.2d at 199 (citation omitted) (emphasis in original). Factors that are relevant to the determination of whether police "should have known" their conduct was

likely to elicit an incriminating response include: (1) "the intent of the police"; (2) whether the "practice is designed to elicit an incriminating response from the accused"; and (3) "[a]ny knowledge the police may have had concerning the unusual susceptibility of a defendant to a particular form of persuasion . . . ." *Innis*, 446 U.S. at 302, 64 L. Ed. 2d at 308 (fn. 7, 8).

Defendant argues that Agent East's conduct, from the time defendant invoked his right to counsel until he signed the waiver of rights, "constitutes words and actions reasonably likely to elicit an incriminating response." However, there is nothing in the record that suggests Agent East's words and conduct were intended to accomplish anything other than to scrupulously honor defendant's rights. Considering that East had traveled from North Carolina to Virginia to speak with defendant, it was not unreasonable for East to attempt to ascertain the name of defendant's Virginia attorney in the hope that the attorney's presence could be procured promptly in order that the interview might be conducted before East returned to North Carolina. Once this effort failed, however, East unequivocally told defendant he would be willing to listen to defendant only after defendant had an opportunity to speak with his attorney. It was at this point that defendant re-initiated communication with the officers. Moreover, nothing in the record tends to suggest any knowledge on the part of Agent East concerning any unusual susceptibility by defendant to any particular form of persuasion. Therefore, we cannot say this practice was designed to elicit an incriminating response from defendant. Similarly, we cannot say that Agent East should have known his conduct was reasonably likely to elicit an incriminating response from defendant. Accordingly, we conclude that Agent East's conduct did not constitute interrogation under the Fifth Amendment.

**[3]** Relying on *State v. Lang*, 309 N.C. 512, 308 S.E.2d 317 (1983), defendant next argues that the order denying suppression was fatally defective for want of a specific finding of fact as to who reinitiated the communication between defendant and the officers after defendant invoked his right to counsel. We disagree.

"The general rule is that, at the close of a *voir dire* hearing to determine the admissibility of a defendant's confession, the presiding judge *should* make findings of fact to show the basis of his ruling." *Id.* at 520, 308 S.E.2d at 321.

If there is a *material* conflict in the evidence on *voir dire* he *must* do so in order to resolve the conflict. If there is no con-

flict in the evidence on *voir dire*, it is not error to admit a confession without making specific findings of fact, although it is always the better practice to find all facts upon which the admissibility of the evidence depends. In that event the necessary findings are implied from the admission of the confession into evidence.

*State v. Riddick*, 291 N.C. 399, 408-09, 230 S.E.2d 506, 512 (1976) (citations omitted).

In *Lang*, our Supreme Court construed *Edwards v. Arizona*, 451 U.S. 477, 68 L. Ed. 2d 378 (1981), and *Oregon v. Bradshaw*, 462 U.S. 1039, 77 L. Ed. 2d 405 (1983), to require, in cases like *Lang*: (1) "a finding of fact as to who initiated the communication between the defendant and the officers which resulted in his inculpatory statement while in custody and after he had invoked the right to have counsel present during interrogation," *Lang*, 309 N.C. at 521, 308 S.E.2d at 321-22; and (2) "findings and conclusions establishing whether the defendant validly waived the right to counsel and to silence under the totality of the circumstances . . . ." *Id.* at 522, 308 S.E.2d at 322. However, *Lang* is inapposite here because in *Lang*, material conflicts existed in the evidence presented on *voir dire*, particularly with respect to who initiated the contact between defendant and the police after defendant first invoked his right to counsel. *Id.* at 520-21, 308 S.E.2d at 321.

Here, unlike *Lang*, the factual evidence presented during *voir dire* was uncontroverted. The only conflict concerned the legal conclusions to be drawn from the evidence presented. Therefore, it was not necessary for the trial judge to make a specific finding of fact on this issue. Furthermore, the trial judge specifically found:

10. Agent East informed the defendant orally and in writing of his *Miranda* rights. Defendant stated that he would not sign the waiver of his rights and that he wanted to talk with an attorney.

11. Agent East gave the defendant his business card and told defendant to call him if defendant changed his mind. As Agent East and Det. Hairr were leaving the room, defendant snatched the *Miranda* rights form and signed the waiver, stating that he wanted to talk with the officers regarding the murder he committed in Erwin, North Carolina.

. . . .

14. Defendant understood and waived his *Miranda* rights, and his statement to these officers was made freely and voluntarily. He was rational and coherent throughout his conversation with the officers.

We conclude that the fact that defendant initiated further contact with the officers may fairly be implied from the facts found by the trial court. Accordingly, this assignment of error is rejected.

## III.

**[4]** Defendant next contends the trial court erred by failing to suppress the statement he made to Sergeant Wilkins on 15 July 1999. Defendant first argues that Sergeant Wilkins was required to advise him of his constitutional rights under *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694 (1966). We disagree.

"It is well established that *Miranda* warnings are required only when a defendant is subjected to custodial interrogation." *State v. Patterson*, 146 N.C. App. 113, 121, 552 S.E.2d 246, 253 (2001), *disc. review denied*, 354 N.C. 578, 559 S.E.2d 549 (2001). Because the determination of whether a defendant was in custody is a question of law, it is fully reviewable here. *State v. Briggs*, 137 N.C. App. 125, 128, 526 S.E.2d 678, 680 (2000).

> "A person is in custody, for purposes of *Miranda*, when he is 'taken into custody or otherwise deprived of his freedom of action in any significant way,' " and an inmate who is subject to a custodial interrogation is entitled to *Miranda* warnings[.] An inmate, however, is not, because of his incarceration, automatically in custody for the purposes of *Miranda*; rather, whether an inmate is in custody must be determined by considering his freedom to depart from the place of his interrogation.

*Id.* at 129, 526 S.E.2d at 680-81 (citations omitted) (emphasis added).

Factors which bear on the determination of whether an inmate is in custody for purposes of *Miranda* include: (1) whether "the inmate was free to refuse to go to the place of the interrogation"; (2) whether "the inmate was told that participation in the interrogation was voluntary and that he was free to leave at any time"; (3) whether "the inmate was physically restrained from leaving the place of interrogation"; and (4) whether "the inmate was free to refuse to answer questions." *Id.*

STATE v. FISHER

[158 N.C. App. 133 (2003)]

In *Briggs,* the defendant inmate was under investigation for communicating threats to someone outside the institution. Defendant was placed in segregated lockup, pending the outcome of the investigation. Prior to being questioned by jail officials, defendant was escorted to an office "in waist restraints and handcuffs." *Id.* The investigating officer, Stancil, testified that defendant was "required" to come to his office and defendant remained physically restrained throughout the interrogation. However, defendant was at all times " 'free not to talk' and return to his cell." *Id.* at 129, 526 S.E.2d at 681. This Court concluded that because defendant "was free to leave Stancil's office and return to his cell at any time, [he] was not in custody for the purposes of *Miranda.*" *Id.*

Here, Wilkins testified that at the time defendant was brought to her office, she "didn't have a reason to talk to him." Wilkins arranged to have defendant brought to her office only after she was informed that defendant "wanted to provide [her] with information about a murder." Defendant was escorted to Wilkins' office by one jail officer, who waited outside Wilkins' office during the interview. Defendant was neither handcuffed nor restrained and was at all times "free to quit talking and get up and walk out of [the] office." Indeed, defendant left Wilkins' office and was returned to his housing unit after the conversation.

Like *Briggs,* defendant was at all times free not to talk and return to his cell. Indeed, defendant exercised both of these rights at different points during the interview. However, unlike *Briggs,* it was defendant who initiated the meeting with Wilkins. Defendant's presence was not required. Moreover, at no time was defendant physically restrained from leaving Wilkins' office. We conclude defendant was not "in custody" for purposes of *Miranda* on 15 July 1999. Because defendant was not subjected to "custodial interrogation," Sergeant Wilkins was not required to give defendant his *Miranda* warnings prior to the interview.

[5] Defendant next argues that Sergeant Wilkins was required to terminate the interrogation once defendant invoked his right to remain silent. We disagree.

"Once [*Miranda*] warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda,* 384 U.S. at 473-74, 16 L. Ed. 2d at 723. However, the protections of *Miranda* and the

Fifth Amendment are only implicated when a criminal defendant is subjected to custodial interrogation. *Patterson,* 146 N.C. App. at 121, 552 S.E.2d at 253. Because we have already concluded that defendant was not in custody for purposes of *Miranda,* Sergeant Wilkins was not prohibited from inquiring into the motivation behind defendant's sudden change of heart. Accordingly, this assignment of error is rejected.

## IV.

**[6]** Defendant next contends the trial court erred by failing to suppress the statement he made to Officer Glover on 14 July 1999. Defendant argues that Officer Glover was required to give him *Miranda* warnings prior to interviewing him. We disagree.

We reiterate that *Miranda* warnings are only required when a criminal defendant is subjected to custodial interrogation, *Patterson,* 146 N.C. App. at 121, 552 S.E.2d at 253, and the determination of whether an inmate is "in custody" for purposes of *Miranda* depends upon "his freedom to depart from the place of his interrogation." *Briggs,* 137 N.C. App. at 129, 526 S.E.2d at 681.

Here, defendant asked Officer Glover to let him out of his individual cell so he could talk with Officer Glover in private. Defendant was allowed to walk, unescorted and unrestrained, from his cell to the control pod where Officer Glover was working. Defendant remained, at all times, free to terminate the conversation with Officer Glover and return to his cell and indeed did so once he was told that another officer would take his statement the following day. Because defendant was not "in custody," Officer Glover was not required to give him his *Miranda* warnings. Accordingly, this assignment of error is rejected.

## V.

**[7]** Defendant next contends the trial court erred by failing to suppress his statements to Officer Glover and Sergeant Wilkins without first making specific findings and conclusions concerning his mental capacity. Defendant first argues that the trial court was required to make specific findings concerning his mental capacity to validly waive his rights under *Miranda*. We disagree.

We have already noted that the trial court is required to enter specific findings only if there is a "*material* conflict in the evidence on *voir dire . . . .*" *State v. Riddick,* 291 N.C. 399, 408-09, 230 S.E.2d 506,

512 (1976). However, if the only conflict in the evidence is *immaterial*, meaning it has no effect on the admissibility of the confession, it is not error to admit the confession without specific findings. *Id.* at 409, 230 S.E.2d at 512-13.

Here, we have concluded that neither Officer Glover nor Sergeant Wilkins were required to give defendant his *Miranda* warnings. We hold it was not error for the trial court to admit defendant's confession without a specific finding on defendant's capacity to waive his rights under *Miranda* since admissibility of defendant's statements to these officers was not dependent upon the validity of any waiver of his *Miranda* rights.

Defendant next argues that because his evidence "rais[ed] a serious question" as to his mental capacity on 14 and 15 July 1999, specific findings were required before the trial court could properly admit any extra-judicial confessions made during that time. We agree. However, after careful review of the record and transcript, we conclude defendant suffered no prejudice.

Because a confession that is given while a defendant is insane is not given freely, voluntarily and understandingly, both the Fifth and Fourteenth Amendments prohibit subsequent admission of that confession against the defendant at trial. *See Blackburn v. Alabama*, 361 U.S. 199, 4 L. Ed. 2d 242 (1960); *State v. Ross*, 297 N.C. 137, 254 S.E.2d 10 (1979). Moreover, "[w]hen there is a material conflict in the evidence on *voir dire*, the judge *must* make findings of fact resolving any such material conflict." *State v. Lang*, 309 N.C. 512, 520, 308 S.E.2d 317, 321 (1983) (emphasis omitted).

Here, defendant moved to suppress his confessions on grounds that *inter alia*, he was psychotic when he confessed. During *voir dire*, defendant offered the testimony of Dr. Nicole Wolfe, an expert in the field of forensic psychiatry. Dr. Wolfe testified that she had evaluated defendant in February 2001 and determined that he was competent to stand trial. Although Dr. Wolfe stated that she was unable to form an opinion concerning defendant's competence on 15 July 1999, she testified that after reviewing the record she had noted a number of contemporaneously occurring "behavioral manifestations" that made her "question his mental state." The manifestations to which Dr. Wolfe testified consisted primarily of: (1) defendant's diagnosis as suffering from Bipolar I disorder, which is characterized by "rapidly shifting mood disturbances"; (2) defendant's demonstration of the symptoms of "acute depression"; (3) defendant's confes-

sion and suicide attempt which occurred approximately one week after the discontinuance of one of his medications, Haldol, which had been prescribed "because of acute psychotic episodes"; (4) defendant's statement that he heard voices telling him to eat feces and drink urine until he died; and (5) Liberty Forensic Unit's 22 July 1999 assessment that defendant had "decompensated psychiatrically" on 15 July 1999. While the State presented no expert testimony in rebuttal, the State's witnesses, *i.e.*, the officers who questioned defendant, testified that defendant appeared rational, coherent and in full possession of his faculties throughout their conversations with him.

We conclude specific findings on the issue of defendant's competency at the time he confessed were a prerequisite to the admission of defendant's statements. However, we conclude that the absence of findings here was harmless beyond a reasonable doubt. N.C. Gen. Stat. § 15A-1443(b) (1999).

First, the trial court properly admitted defendant's 16 July 1999 confession to Agent East. In its order, the trial court specifically concluded that defendant had the mental capacity to "freely, knowingly, and understandingly waive his *Miranda* rights on July 16, 1999." As this conclusion is adequately supported by the trial court's findings of fact which are supported by competent evidence in the record, it is binding on appeal. *State v. Brewington*, 352 N.C. 489, 498, 532 S.E.2d 496, 501 (2000), *cert. denied*, 531 U.S. 1165, 148 L. Ed. 2d 992 (2001). Moreover, since defendant's 16 July confession comprehensively outlined all of the events and details that had theretofore been provided, even in the absence of the two previous confessions, there is no reasonable possibility that there would have been a different result at trial.

Next, a confession must be excluded only when, after considering all of the circumstances and the entire record, " 'the evidence indisputably establishes the strongest probability that the defendant was insane and incompetent at the time he allegedly confessed.' " *Ross*, 297 N.C. at 141, 254 S.E.2d at 12 (emphasis omitted) (quoting *Blackburn v. Alabama*, 361 U.S. 199, 207, 4 L. Ed. 2d 242, 248 (1960)).

In *Ross*, there was evidence tending to establish the following: (1) the defendant's history indicated that he had been mentally ill for the past twelve to thirteen years, which had caused defendant to be hospitalized several times; (2) the defendant had not worked for any appreciable period of time in five years; (3) the defendant had been

involuntarily committed for an unrelated incident just one week prior to the confession; (4) three days before the confession, the defendant had been taken to a mental health clinic, where he received medication and made an appointment to see a psychiatrist; (5) the therapist who spoke with the defendant that day testified that "the defendant's mood and affect were 'inappropriate,' he had 'poor judgment,' and 'there was a very high likelihood that he was suffering from psychotic conditions,' specifically schizophrenia"; (6) the defendant's brother testified that during the days immediately preceding the crime and confession, defendant was scheduled to work for him, however, defendant's condition and bizarre behavior prevented him from working; (7) the defendant's condition had deteriorated to the point that his brother had to arrange for someone to stay with the defendant during the day because he was incapable of taking care of himself; (8) the defendant's brother testified that on the day of the crime, the day before the confession, the defendant "looked like he was just off"; (9) the victim testified that at the time of the crime the defendant "looked strange"; (10) the psychiatrist who interviewed defendant three days after he made the confession testified that the "defendant was suffering from 'chronic, undifferentiated schizophrenia,' which includes delusions and a 'misinterpretation of reality' . . . and [that] the defendant is much more likely to be sane when he takes his medication"; and, (11) the evidence in the record tended to suggest that defendant had not taken his medicine for some time prior to his confession. *Id.* at 141-42, 254 S.E.2d at 12-13. The *Ross* court concluded that these facts compelled the conclusion that the confession was "made when the accused was in all probability mentally incompetent." *Id.* at 144, 254 S.E.2d at 14.

Here, the record indicates that defendant's history of mental illness began in 1990 when he was evaluated to determine whether he was "too depressed to go to court on charges of arson." Defendant was diagnosed as having an "adjustment disorder and discharged back to [the] court." Defendant next saw mental health authorities in May 1999, when he was evaluated following an arrest that stemmed from the loss of his job for bizarre behavior and an assault on his uncle. Defendant was diagnosed as having Bipolar disorder and was released with a prescription for Depakote. Defendant was evaluated again in July 1999, following his confession to Sergeant Wilkins and subsequent suicide attempt.

While defendant was found to have "decompensated psychiatrically" on 15 July, unlike *Ross*, defendant was not diagnosed as psy-

chotic at this time. On the contrary, "[h]is emotional state was thought to be affected by the possibility of additional charges." Furthermore, defendant's Haldol treatment was discontinued at his own request on 7 July after the psychiatrist noted that defendant "had been stable on [Depakote] before." Following this discontinuance, no aberrant behavior on the part of defendant was noted by anyone associated with the jail until he told a jail officer he was contemplating suicide, approximately six and one-half hours after he confessed to Sergeant Wilkins.

The record further indicates that apart from the May 1999 incident involving his uncle, defendant had no trouble securing or maintaining a job, despite his dependence on alcohol and chronic abuse of a wide variety of illegal drugs. Likewise, there is no indication that defendant had ever been involuntarily committed or evaluated psychiatrically at any time other than during periods of incarceration for various criminal charges. Finally, while Dr. Wolfe testified that certain circumstances caused her to question defendant's mental capacity on 15 July 1999, neither she nor any of the other physicians she consulted were able to formulate an opinion concerning defendant's competency during this time. In fact, Dr. Wolfe admitted on cross-examination that defendant's suicide attempt could just as easily have been attributable to depression, which is a characteristic of Bipolar I disorder.

Accordingly, we conclude that the evidence fails to " 'indisputably establish[] the strongest probability that the defendant was insane and incompetent at the time' " of his confession. *Ross*, 297 N.C. at 141, 254 S.E.2d at 12 (emphasis and citation omitted). We hold defendant suffered no prejudice by the trial court's failure to make findings concerning his competency on 14 and 15 July 1999.

The dissent maintains that defendant is entitled to a new suppression hearing, in part because "the trial court improperly shifted the burden of proof to defendant regarding the voluntariness of his confessions and his competency to waive his *Miranda* rights . . . ." We note that the scope of appellate review is "confined to a consideration of those assignments of error set out in the record on appeal," N.C.R. App. P. 10(a), and "presented in the several briefs." N.C.R. App. P. 28(a). This question was not the subject of an assignment of error and therefore is not subject to review by this Court. Indeed, because this contention is not discussed in defendant's brief, it is beyond the scope of our review.

**STATE v. FISHER**

[158 N.C. App. 133 (2003)]

Even if the issue were before us, based on the same reasoning applied in *State v. Cheek*, 307 N.C. 552, 299 S.E.2d 633 (1983), we hold that any error was harmless beyond a reasonable doubt. First, the trial court here made no remarks during *voir dire* that indicated the burden had been shifted to defendant. Indeed, careful review of the record and transcript reveals that the burden of persuasion remained on the State at all times during the suppression hearing. Moreover, although the trial judge concluded that defendant "failed to establish that [he] lacked mental capacity," the trial judge did not "couch his findings" in this language, *id.* at 558, 229 S.E.2d 637; rather, the trial court's findings of fact and conclusions of law affirmatively stated that defendant "was rational and coherent throughout his conversation with the officers" and "freely, knowingly and voluntarily waived his *Miranda* rights." Finally, these findings and conclusions are amply supported by the evidence, notwithstanding the existence of evidence to the contrary.

*VI.*

**[8]** Defendant next contends the trial court erred by entering a written judgment which fails to reflect that the life sentence was to run concurrently with the sentence defendant was already serving. Defendant argues that because this was an essential term of his plea agreement, the failure of the trial court to indicate it on the face of the judgment deprived him of due process of law. We disagree.

G.S. 15A-1354 gives the trial court express authority to determine whether sentences shall run concurrently or consecutively. The statute provides in part:

> When multiple sentences of imprisonment are imposed on a person at the same time or when a term of imprisonment is imposed on a person who is already subject to an undischarged term of imprisonment, including a term of imprisonment in another jurisdiction, the sentences may run either concurrently or consecutively, as determined by the court. If not specified or not required by statute to run consecutively, sentences shall run concurrently.

N.C. Gen. Stat. § 15A-1354(a) (1999).

Unless a statute requires the sentences to run consecutively or the trial court's judgment specifies that the sentences shall run consecutively in the judgment, the sentences must, as a matter of law, run concurrently. *Id.*; *State v. Wall*, 348 N.C. 671, 675, 502 S.E.2d 585, 587 (1998).

Here, defendant was convicted and sentenced for violating G.S. 14-17. There is no provision in G.S. § 14-17 requiring that sentences imposed under that statute run consecutively with any other undischarged sentences. The judgment does not specify whether defendant's sentence is to run concurrently or consecutively. By statute, defendant's life sentence must run concurrently with his remaining undischarged sentences. Accordingly, we conclude defendant suffered no prejudice as a result of the trial court's failure to have the judgment reflect this particular term of defendant's plea agreement.

## VII.

[9] Defendant's final contention is that the indictment upon which his conviction is based will not support a conviction of first-degree murder because it fails to specifically allege any of the circumstances enumerated in G.S. § 14-17 that elevate second-degree murder to first-degree murder. We disagree.

Our Supreme Court has consistently held that "[a]n indictment that complies with the requirements of N.C.G.S. § 15-144 will support a conviction of both first-degree and second-degree murder." *State v. Braxton*, 352 N.C. 158, 174, 531 S.E.2d 428, 437 (2000), *cert. denied*, 531 U.S. 1130, 148 L. Ed. 2d 797 (2001). Moreover, because G.S. 14-17 is specifically referenced on the short-form murder indictment, it will support a conviction of first-degree murder under any theory set forth in G.S. 14-17, without the need for a separate allegation of the particular theory upon which first-degree murder is based. *Id.*

Here, the indictment upon which defendant was convicted complied in all respects with the requirements of G.S. 15-144. Accordingly, we conclude this assignment of error is without merit.

We hold that defendant received a fair trial, free from prejudicial error.

No prejudicial error.

Judge MARTIN concurs.

Judge GEER dissents in a separate opinion.

GEER, Judge dissenting.

Because I believe that the trial court improperly shifted the burden of proof to defendant regarding the voluntariness of his confes-

sions and his competency to waive his *Miranda* rights, I respectfully dissent. I would reverse and remand for a new hearing on defendant's motion to suppress.

As the majority notes, a trial court's findings of fact are conclusive on appeal as long as they are supported by competent evidence, even if the record contains conflicting evidence. *State v. Eason*, 336 N.C. 730, 445 S.E.2d 917 (1994), *cert. denied*, 513 U.S. 1096, 130 L. Ed. 2d 661 (1995). When, however, those findings have been made under a misapprehension of the law, they must be set aside and the case remanded so that the evidence may be considered in its true legal light. *Helms v. Rea*, 282 N.C. 610, 620, 194 S.E.2d 1, 8 (1973). I believe that is the situation here.

The majority states that the burden of proof issue is not the subject of an assignment of error and, therefore, should not be addressed by this Court. I believe that this issue is encompassed within assignments of error 4, 5, and 6. Although those assignments of error are broad, they are no broader than assignments of error routinely assumed to pass muster by this Court in other cases. I see no reason to elect to impose a more rigorous standard for assignments of error in this case than in cases where less is at stake.

While the majority is correct that the burden of proof issue was not specifically briefed, I believe that this case presents a classic example of when this Court should suspend its rules "[t]o prevent manifest injustice to a party." N.C.R. App. P. 2. I can conceive of no more fundamental an error than placing the burden of proof on the wrong party in a criminal case. Given the fundamental nature of the error, the sparseness of the evidence presented by the State on competence when contrasted to the expert evidence of defendant, and the consequences of this error (life imprisonment without parole), I believe that the Court should address this issue.

I

In denying defendant's motion to suppress, the trial court concluded: "Defendant has failed to establish that defendant lacked the mental capacity to freely, knowingly, and understandingly waive his *Miranda* rights on July 16, 1999." The trial court thus placed the burden of proof on defendant. The law is, however, unquestionably otherwise.

Both this Court and the Supreme Court have repeatedly confirmed that the State bears the burden of proof as to the voluntariness

STATE v. FISHER

[158 N.C. App. 133 (2003)]

of a confession and as to the validity of a waiver of *Miranda* rights. *See, e.g., State v. Knight*, 340 N.C. 531, 550, 459 S.E.2d 481, 493 (1995) ("The State bears the burden of proving that a defendant made a knowing and intelligent waiver of his rights and that his statement was voluntary."); *State v. Brown*, 112 N.C. App. 390, 396, 436 S.E.2d 163, 167 (1993) ("A defendant may waive his Miranda rights, but the State bears the burden of proving that the defendant made a knowing and intelligent waiver."), *disc. review denied*, 335 N.C. 561, 441 S.E.2d 124 (1994), and *aff'd per curiam*, 339 N.C. 606, 453 S.E.2d 165 (1995); *State v. Williams*, 59 N.C. App. 15, 24, 295 S.E.2d 493, 498 (1982) ("Upon reviewing the evidence before the court on the motion to suppress [based on incompetency], we hold that the State failed to meet its heavy burden to affirmatively demonstrate a knowing and intelligent waiver by defendant."). The trial court's requirement that defendant "establish" his lack of mental capacity cannot be reconciled with this well-established principle.

*State v. Cheek*, 307 N.C. 552, 299 S.E.2d 633 (1983) confirms this conclusion. In *Cheek*, the defendant argued that "the trial judge impermissibly placed the burden of proving that the statement was not voluntarily made on defendant" by stating at the beginning of the voir dire hearing on the defendant's motion to suppress, " 'The burden is on the defendant on a motion to suppress.' " *Id.* at 556, 299 S.E.2d at 636. In addressing this argument, the Supreme Court first noted that when a trial judge conducts a hearing on the voluntariness of a statement, "the burden is upon the state to demonstrate the admissibility of the challenged evidence; and, in the case of a confession, the state must affirmatively show (1) the confession was voluntarily made, (2) the defendant was fully informed of his rights and (3) the defendant voluntarily waived his rights." *Id.* at 557, 299 S.E.2d at 636. To meet this burden, "the state must persuade the trial judge, sitting as the trier of fact, by a preponderance of the evidence that the facts upon which it relies to sustain admissibility and which are at issue are true." *Id.*, 299 S.E.2d at 636-37.

In determining in *Cheek* that the trial court did not shift the burden of proof, but rather only placed on defendant the burden of going forward, the Supreme Court stressed that the trial court had not made any statement such as "defendant has failed to show that the statement was not voluntarily given." *Id.* at 558, 299 S.E.2d at 637. Such a statement "would have indicated that he impermissibly placed the burden of persuasion on defendant." *Id.* In this case, by contrast, the trial court's order includes precisely such a statement. Conclusion of

law number five establishes that the court erroneously shifted the burden of proof to defendant when our case law is clear that the State has the "heavy burden to affirmatively demonstrate a knowing and intelligent waiver by defendant." *Williams*, 59 N.C. App. at 24, 295 S.E.2d at 498.

The majority claims that *Cheek* supports the conclusion that any error was harmless beyond a reasonable doubt. I see no meaningful distinction between the conclusion of law in this case—"[d]efendant has failed to establish that defendant lacked the mental capacity" to waive his rights—and the statement used in *Cheek*—"defendant has failed to show that the statement was not voluntarily given"—as an example of a statement demonstrating that the court "impermissibly placed the burden of persuasion on defendant." *Cheek*, 307 N.C. at 558, 299 S.E.2d at 637. The lack of any reference to the burden of proof in the findings of fact is not a surprise since the burden of proof is a question of law properly included in the conclusions of law. I am not willing to assume that the trial court applied the correct burden of proof when the written conclusion of law in his order so plainly indicates otherwise.

I also cannot conclude that this fundamental error is harmless beyond a reasonable doubt. Ample evidence exists from which a trial court could have concluded that the State did not meet its burden of demonstrating that defendant properly waived his *Miranda* rights and voluntarily confessed.

The relevant evidence—left unchallenged by the State and unaddressed by the trial court—includes much of Dr. Wolfe's testimony regarding defendant and the Dorothea Dix report submitted by defendant. The Dix report was based on interviews with Fisher, review of prior hospital records, and information obtained from Fisher's attorney, the county jail, the clerk of court, and the district attorney.

The Dix report indicates that Fisher reported his first hospitalization as occurring at age 18 (approximately in 1982) for a suicide attempt. Due to suicide attempts, threats, and "women problems," he was admitted to psychiatric hospitals in Virginia on three other occasions. In addition, he was assessed at Central State Hospital in Virginia in 1990 because of a concern that he was too depressed to stand trial.

In addition to these hospital admissions, evidence in the record shows that immediately before Fisher was jailed in Virginia in May

1999, he had "a number of manic/psychotic episodes." He was admitted to the Peninsula Behavioral Center on 14 May 1999 because of bizarre behavior towards his boss, including placing three Christian crosses on his boss' desk after concluding that his boss was evil, and his becoming belligerent and assaultive in an emergency room. Around this same time, Fisher assaulted his uncle and broke his nose because a voice told Fisher that his uncle was a demon. The Dix report concludes that Fisher had engaged in bizarre behavior and was hyper-religious.

Fisher reported to the Dix team that while he was in jail in 1999 "voices were driving him crazy so he talked to a guard about what happened in North Carolina." The report also states that the voice of God always talked to Fisher while he was in Virginia.

Dr. Wolfe testified that two months before the confession, defendant was "very psychotic" and required commitment to two different psychiatric hospitals. According to Dr. Wolfe, on 7 July 1999 defendant's Haldol—an antipsychotic agent—was discontinued. Dr. Wolfe further testified that by 19 July 1999—three days after the East confession—defendant again "had become quite psychotic, talking about needing to . . . drink urine and eat feces until he died." He was put back on Haldol.

No medical records exist from 15 or 16 July 1999, but Dr. Wolfe reviewed the records from Liberty Forensic Unit, which indicated that defendant was admitted there on 22 July 1999. She noted that Liberty reported that Fisher "had decompensated psychiatrically on 7/15/99." She explained: "It means that somebody has been doing well and then pretty acutely, pretty suddenly, they're not doing well at all."

Although Dr. Wolfe desired additional information—apparently medical records from other states—in order to further assess whether or not defendant was competent when he confessed, Dr. Wolfe testified that when Fisher made his confessions, "he was not mentally stable." She explained: "That to me means within a week of getting off of the antipsychotic medication, he became psychotic. That date coincides with the date he gave his confession on the 15th. And several days later, he got admitted to the state psychiatric facility where he stayed for almost two months." The Dix report also flatly concludes: "He became psychotic again on the day of his confession." Dr. Wolfe explained that "[p]sychosis is a term that we refer to being out of touch with reality. Mr. Fisher has a lot of reli-

gious preoccupations. He has been very psychotic on several occasions to the point where he clearly did not know reality from what was in his mind."

At the hearing below, despite this extensive evidence, the State barely acknowledged the need to determine defendant's competency to confess or waive his rights. The State did not even bother to address that issue in its argument to the trial court on the motion to suppress. And, when the State's evidence is placed on the other side of the scale from defendant's evidence, the scale hardly moves. In opposition to the expert evidence from employees of the State, the prosecution offered only the lay opinion testimony of three law enforcement officers that Fisher appeared depressed, but coherent; that he was able to carry on logical conversations; and that he appeared rational. During the conversation with Agent East, however, Fisher was in paper clothing because of a suicide attempt.

*State v. Ross*, 297 N.C. 137, 254 S.E.2d 10 (1979), discussed by the majority, demonstrates that the evidence before the trial court was sufficient to lead to the conclusion that the State failed to meet its burden of proof.[1] In *Ross*, the defendant had a history of mental illness with several prior hospitalizations; he had not worked for five years; a week before his confession, he was involved in an incident that led to involuntary commitment; three days before the confession there was a very high likelihood that he was suffering from psychotic conditions; he engaged in bizarre behavior before the confession; he was placed on medication; while in jail, he did not have access to his medication; and three days after the confession, he was diagnosed as suffering from schizophrenia, including delusions and a misinterpretation of reality. *Id.* at 141-42, 254 S.E.2d at 12-13. The State relied only upon the testimony of a deputy sheriff, present during defendant's statement, that the defendant was logical and made sense. The *Ross* Court found the totality of evidence to be "compelling facts" justifying a conclusion of incompetency. *Id.* at 144, 254 S.E.2d at 14.

The evidence before this Court substantially parallels that of *Ross*. It suggests that Fisher had a history of mental illness and hospitalizations; that shortly before his confession he engaged in bizarre behavior causing him to be fired, arrested, hospitalized twice, deemed psychotic, and placed on the anti-psychotic medication Haldol; that he confessed while no longer taking his anti-psychotic

---

1. *Ross* can even be read as requiring a conclusion of incompetency on appeal, but I believe that the trial court should be given an opportunity to address the question in the first instance employing the proper burden of proof.

medication;[2] that he was psychotic and mentally unstable when making his confessions; and that, immediately following his confession, he again engaged in bizarre behavior and was deemed psychotic to the point of being out of touch with reality. Also, just as in *Ross*, the only evidence from the State was lay opinion testimony from law enforcement officers regarding Fisher's behavior during their meetings with him. If such evidence was sufficient in *Ross* to establish incompetency as a matter of law, it certainly defeats any argument that the trial court's improper burden shifting was harmless beyond a reasonable doubt.

I agree with the majority that the trial court erred in failing to make factual findings regarding defendant's competency during his statements to Glover and Wilkins. The majority, however, also holds that the error is harmless because of the admissibility of the 16 July 1999 confession to Agent East. Because I would hold that the trial court erred with respect to the East confession, I would further find that the trial court's error as to the statements to Glover and Wilkins was not harmless. I would, therefore, remand for a hearing on defendant's competency to make all three confessions.

## II

In addition, I do not believe that the trial court's findings of fact are adequate under *Ross* and *Blackburn v. Alabama*, 361 U.S. 199, 4 L. Ed. 2d 242 (1960) to support its conclusion of law that defendant was competent when he confessed. For this alternative reason, I would also vacate the trial court's ruling on the motion to suppress and remand for a new hearing.

The only finding of fact purporting to support the conclusion that defendant's confession to Agent East was made voluntarily and that he properly waived his *Miranda* rights is finding of fact number fourteen: "He was rational and coherent throughout his conversation with the officers."[3] In *Ross*, the only evidence was likewise the testimony

2. Although the majority opinion suggests that a psychiatrist stated that defendant had been stable on Depakote even without Haldol, Dr. Wolfe's testimony indicates that it was only defendant—hardly a reliable witness as to his own stability—who claimed he had been stable on Depakote. The record contains no expert evidence that he was in fact stable when receiving only Depakote.

3. While the trial court's finding of fact number sixteen recites some of Dr. Wolfe's testimony, it excludes her opinion that Fisher was psychotic and mentally unstable at and around the time of his confession. Her conclusion that defendant was competent to stand trial, rendered in February 2001 (and included in the finding of fact), is irrelevant to whether he was competent when he confessed in July 1999. *State v. Reid*, 38

of a deputy sheriff that the defendant appeared logical and made sense. This evidence was deemed insufficient to establish competency because our Supreme Court was unwilling to "uphold the admission of defendant's confession on the mere chance that it was made during a lucid interval of the defendant." *Ross*, 297 N.C. at 143, 254 S.E.2d at 14. In reaching this conclusion, the Court relied on *Blackburn*, in which the United States Supreme Court likewise found that testimony of a deputy that defendant talked sensibly, was clear-eyed, and did not appear nervous was insufficient to establish competency. The Court held: "But without any evidence in the record indicating that these observed facts bore any relation to Blackburn's disease or were symptoms of a remission of his illness, we are quite unable to conclude that such an inference can be drawn." *Blackburn*, 361 U.S. at 209, 4 L. Ed. 2d at 249-50.

I cannot agree to affirm the trial court's ruling when its findings do no more than parrot the same evidence found inadequate in *Ross* and *Blackburn*. The majority opinion does not address this issue, which was properly presented by defendant.

For all the foregoing reasons, I would reverse the trial court and remand for a new hearing on the motion to suppress at which the State would bear the burden of proving the admissibility of defendant's statements.

N.C. App. 547, 248 S.E.2d 390 (1978) (expert testimony that a defendant was mentally capable to proceed to trial did not establish competency two to three months later), *disc. review denied,* 296 N.C. 588, 254 S.E.2d 31 (1979).