IN THE COURT OF APPEALS OF NORTH CAROLINA

 No. COA15-53

 Filed: 20 October 2015

Union County, No. 12CRS055887

STATE OF NORTH CAROLINA

 v.

TAE KWON HAMMONDS, Defendant.

 Appeal by defendant from judgment entered on or about 2 July 2014 by Judge

Tanya T. Wallace in Superior Court, Union County. Heard in the Court of Appeals

on 13 August 2015.

 Attorney General Roy A. Cooper III, by Assistant Attorney General Joseph E.
 Elder, for the State.

 Appellate Defender Staples S. Hughes, by Assistant Appellate Defender
 Barbara S. Blackman, for defendant-appellant.

 STROUD, Judge.

 Tae Kwon Hammonds (“defendant”) appeals from a judgment entered after a

jury found him guilty of robbery with a dangerous weapon. Defendant argues that

the trial court erred in (1) denying defendant’s motion to suppress statements made

to police officers while he was involuntarily committed; and (2) ordering that

defendant pay $50 in restitution. We find no error in part, vacate in part, and

remand.

 I. Background
 STATE V. HAMMONDS

 Opinion of the Court

 The following evidence was presented by the State at trial: At approximately

8:30 p.m. on 10 December 2012, Stephanie Gaddy was walking to her car in a Wal-

Mart parking lot in Monroe when she noticed three men and a woman leaning against

a vehicle about ten parking spaces away. She was about to get into her vehicle when

she was approached from behind by a man who said “give me the money” and

demanded her purse. Ms. Gaddy noticed that the man was carrying a handgun and

realized she was being robbed. The man took her purse and cellphone. At trial, she

described the perpetrator as an African-American male with a deep voice but did not

identify defendant or any other individual as the perpetrator.

 The next day, on 11 December 2012, defendant attempted suicide by taking an

overdose of “white pills” and was brought to Carolinas Medical Center Union Hospital

(“CMC Union”). At 3:50 p.m., while defendant was being treated at the hospital, a

Union County magistrate ordered that defendant be involuntarily committed.

Defendant was placed under 24-hour watch, during which a “sitter” was required to

continuously observe him and accompany him when he left his room. That night,

defendant became agitated and attempted to leave the hospital but was escorted back

to his room by hospital security.

 At approximately 5:00 p.m. the next day, on 12 December 2012, Detective

Jonathan Williams and Lieutenant T.J. Goforth arrived at the hospital to speak with

defendant about the robbery of Ms. Gaddy. The police asked Nurse Jan Kinsella,

 -2-
 STATE V. HAMMONDS

 Opinion of the Court

defendant’s attending nurse at the time, if they could speak with defendant, which

she allowed. The police officers interviewed defendant in his hospital room for

approximately one and a half hours and did not inform defendant of his Miranda

rights. See Miranda v. Arizona, 384 U.S. 436, 16 L. Ed. 2d 694 (1966). During the

interview, defendant confessed to the robbery, though he denied using a gun.

 On or about 4 February 2013, a grand jury indicted defendant for robbery with

a dangerous weapon. See N.C. Gen. Stat. § 14-87 (2011). On or about 30 June 2014,

defendant moved to suppress the statements he made during the police interview on

the grounds that he was subjected to a custodial interrogation without having been

given Miranda warnings, and that his confession was involuntary. The trial court

denied defendant’s motion to suppress and admitted an audio recording of the

interview at trial. The trial court later memorialized its findings of fact and

conclusions of law in a written order. On 2 July 2014, the jury found defendant guilty

of robbery with a dangerous weapon. The trial court sentenced defendant to 60 to 84

months’ imprisonment and ordered that defendant pay $50 in restitution. Defendant

gave notice of appeal in open court.

 II. Motion to Suppress

 Defendant argues that the trial court erred in denying his motion to suppress

because (1) he was “in custody” for purposes of Miranda and did not receive the

Miranda warnings; and (2) his confession was involuntary.

 -3-
 STATE V. HAMMONDS

 Opinion of the Court

A. Standard of Review

 The standard of review in determining whether a
 trial court properly denied a motion to suppress is whether
 the trial court’s findings of fact are supported by the
 evidence and whether its conclusions of law are, in turn,
 supported by those findings of fact. The trial court’s
 findings are conclusive on appeal if supported by
 competent evidence, even if the evidence is conflicting. The
 determination of whether a defendant’s statements are
 voluntary and admissible is a question of law and is fully
 reviewable on appeal.

State v. Cortes-Serrano, 195 N.C. App. 644, 654-55, 673 S.E.2d 756, 762-63 (citations

and quotation marks omitted), disc. review denied, 363 N.C. 376, 679 S.E.2d 138

(2009). “Additionally, the trial court’s determination of whether an interrogation is

conducted while a person is in custody involves reaching a conclusion of law, which

is fully reviewable on appeal.” State v. Buchanan, 353 N.C. 332, 336, 543 S.E.2d 823,

826 (2001).

B. Findings of Fact

 Defendant’s brief recounts much of the evidence from the hearing on the

motion to suppress and notes some findings that the trial court could have made but

did not. But our standard of review as to the findings of fact does not allow us to

substitute our judgment for that of the trial court; the trial court determines the

weight and credibility of the evidence. And this order includes full and detailed

findings of fact, so we need not speculate about the basis for the trial court’s ruling.

Defendant ultimately challenges only small portions of three of the trial court’s

 -4-
 STATE V. HAMMONDS

 Opinion of the Court

Findings of Fact 2, 6, and 13 as unsupported or at least partially unsupported by the

evidence.

 Finding of Fact 2 states as follows:

 That on December 11th, 2012, at approximately 3:50
 p.m., Magistrate Sherry Crowder, a Union County
 Magistrate, issued a custody order for the involuntary
 commitment of [defendant], and directed the Union County
 Sheriff’s Department to deliver [defendant] to a facility for
 examination and treatment. That the paper writing
 introduced into evidence showed that the magistrate found
 that the defendant was mentally ill and dangerous to
 himself or others; and the Sheriff’s Department was
 directed to serve such paper writing on the defendant and
 transport the defendant.

 Defendant argues that Finding of Fact 2 was “partially unsupported by the

evidence, as the court found that the involuntary commitment order directed the

Union County Sheriff’s Department to deliver [defendant] to a facility [for]

treatment.” (Emphasis added.) Defendant is correct that the involuntary

commitment order, issued in Union County, directs “any law enforcement officer” to

“take [defendant] into custody within 24 hours after this order is signed and transport

[defendant] directly to a 24-hour facility designated by the State for the custody and

treatment of involuntary clients and present [defendant] for custody, examination

and treatment pending a district court hearing.” (Emphasis added and portion of

original in all caps.) The evidence also showed that a law enforcement officer from

the Union County Sheriff’s Office executed this order. The exact wording of Finding

 -5-
 STATE V. HAMMONDS

 Opinion of the Court

of Fact 2 is not strictly supported by the record, but defendant has not demonstrated

how the wording of the finding is prejudicial to him, and the substance of the facts is

supported by the record. This argument is without merit.

 Defendant also argues that Finding of Fact 13, “that nurses were in and out of

the room during the interview and that [defendant] ‘was never isolated without the

ability to contact others,’ was unsupported by the evidence.” (Quoting Finding of Fact

13.) Finding of Fact 13 in its entirety is as follows:

 The defendant was interviewed by Detective
 Williams of the Monroe Police Department and Detective
 T.J. Goforth at approximately five p.m. on December the
 12th. They spoke with the defendant for approximately one
 and [a] half hours. No Miranda Rights were given to the
 defendant. On at least three occasions, however, the
 defendant was told that, “there were no arrest warrants
 with the officers,” and that they were not here to “lock you
 up.” Indeed the defendant was not arrested and there were
 no warrants present at the time they spoke with the
 defendant. It is clear from the conversation that the
 officers had with the defendant that they knew that he was
 hospitalized as a result of an overdose, whether accidental
 or intentional, and had been involuntarily committed, and
 would be going for further evaluation and treatment. But
 although the defendant’s words seem to be muttered,
 especially initially, they were appropriate responses to the
 statements or questions from the officers. The defendant
 answered the questions or statements coherently and
 appropriately. Throughout the conversation the defendant
 never asked the officers to leave or to stop talking. There
 was actually a sitter watching the interview, and nurses
 were in and out. The defendant was never isolated without
 the ability to contact others. The tone was conversational
 between the officers and the defendant, although the
 officers would confront the defendant when they believed

 -6-
 STATE V. HAMMONDS

 Opinion of the Court

 that he was being less than truthful. The officers did not
 tell the defendant he was being taped. There is no
 indication that there had been any previous relationship
 between the defendant and the officers. The nurse was not
 an agent of the state [or] government. The defendant was
 not arrested and no warrant issued at the time. The
 defendant was unable to leave the hospital. He was not
 actually at a police station and was not told that he could
 not stop the conversation or request that the officers leave.
 He was never threatened, voices were never raised. The
 only promises made were such that the officers would tell
 the [district attorney] about his cooperation, and that he
 would be in a superior position to others if he told, before
 others did, as to the facts of the circumstances of the
 incident at Wal-Mart.

(Emphasis added.)

 As noted above, only the underlined portion of this finding is challenged by

defendant as unsupported by the evidence. Defendant’s argument relies heavily upon

the hospital records and notations of times that nurses recorded activities in

defendant’s room, stressing periods of time when a nurse was not physically present

in the room. Yet we also note that defendant has not challenged Finding of Fact 8,

which states:

 During the defendant’s stay in the hospital and
 before he spoke with Monroe Police Department, he visited
 with representatives of DayMark, who apparently was the
 provider for his inpatient or outpatient follow-up from the
 hospital. He also had others around, specifically his
 mother, at times during his time in the hospital.

 The trial court’s characterization of the nurses as being “in and out” of the room

is fully supported by the medical records, Nurse Kinsella’s testimony, and the

 -7-
 STATE V. HAMMONDS

 Opinion of the Court

transcript of the audio recording of the police interview. The trial court did not need

to prepare a detailed log of every moment that each person who visited or treated

defendant was in the room. There is no indication in the evidence that defendant was

ever isolated or prevented from contacting others, and Finding of Fact 8, which is

unchallenged, also addresses his contact with others. This argument is also without

merit.

 Defendant also challenges Finding of Fact 6, specifically that defendant was

“normal.” Defendant asserts that the trial court found that he was normal simply

because “he scored a 15 on the Glascow Coma Scale, as the scale does not assess a

patient’s psychiatric or mental state. An alert and conscious patient who says, ‘I want

to walk now to London, England,’ scores 15 on the Glascow Coma Scale.” (Citation

omitted.) Defendant’s argument takes the word “normal” entirely out of context. In

context, the relevant portion of Finding of Fact 6 addresses Nurse Kinsella’s

testimony and states that

 according to her review, a Glascow-Coma Scale was
 administered when the defendant had arrived at the
 [emergency room], which is a quick and objective way to
 determine a patient’s physical and mental state. It
 includes such criteria as the ability of keeping eyes open,
 whether oriented and can converse, obey commands,
 vocalize pain. That the defendant registered a fifteen on
 the Glascow-Coma Scale, (even on admission) and that is
 termed “normal”.

 -8-
 STATE V. HAMMONDS

 Opinion of the Court

 This finding is fully supported by the evidence, and it is not, as defendant

implies, a finding that defendant’s mental state upon his admission to the emergency

room after a suicide attempt and involuntary commitment was entirely “normal.”

The trial court was addressing defendant’s state of consciousness upon arrival at the

emergency room, and in other findings the trial court addresses defendant’s mental

and emotional state, both upon arrival and after treatment, in detail. Defendant does

not challenge those findings as unsupported by the evidence.

 The trial court’s findings of fact which were not challenged on appeal are

binding on this court on appeal, and the challenged findings were supported by the

record, so all of the trial court’s findings of fact are binding on appeal. See State v.

Phillips, 151 N.C. App. 185, 190-91, 565 S.E.2d 697, 701 (2002); State v. Jackson, 308

N.C. 549, 581, 304 S.E.2d 134, 152 (1983).

C. Custody

 i. Automatic Custody

 Defendant’s argument suggests that a defendant who has been involuntarily

committed in the hospital is automatically “in custody” for purposes of Miranda

warnings. The briefs from both defendant and the State focus on cases which have

addressed interrogations in hospital settings where a defendant was voluntarily

seeking medical care, while defendant here was in the hospital due to involuntary

commitment. The dissent also distinguishes the cases dealing with hospitalized

 -9-
 STATE V. HAMMONDS

 Opinion of the Court

defendants because they deal with persons voluntarily in the hospital for treatment

and would require the trial court to apply a new and different analysis to the

questioning of an involuntarily committed person. We agree that involuntary

commitment is different from a voluntary hospitalization, as there is no doubt that

involuntary commitment places a person in custody and his freedom of movement

may be restricted by law enforcement officers. But we believe that cases dealing with

incarcerated defendants who have been questioned regarding other crimes unrelated

to their current imprisonment are instructive on this issue, and our courts have

simply not considered the fact that the defendant is incarcerated as determinative.

Since involuntary commitment is arguably less restrictive than incarceration, and

certainly not more restrictive, we do not adopt a more restrictive rule for involuntary

commitment than for incarceration.

 In determining whether defendant was “in custody” for purposes of Miranda,

this situation is closely analogous to cases which address interviews of a prisoner who

has been incarcerated for another crime, when law enforcement officers attempt to

speak with him about another entirely separate crime. In State v. Fisher, this Court

held that an inmate is not “automatically in custody for the purposes of Miranda[,]”

and our Supreme Court affirmed this ruling per curiam. 158 N.C. App. 133, 145, 580

S.E.2d 405, 415 (2003), aff’d per curiam, 358 N.C. 215, 593 S.E.2d 583 (2004). There,

we noted:

 - 10 -
 STATE V. HAMMONDS

 Opinion of the Court

 It is well established that Miranda warnings are
 required only when a defendant is subjected to custodial
 interrogation. Because the determination of whether a
 defendant was in custody is a question of law, it is fully
 reviewable here.
 A person is in custody, for purposes of
 Miranda, when he is taken into custody or
 otherwise deprived of his freedom of action in
 any significant way, and an inmate who is
 subject to a custodial interrogation is entitled
 to Miranda warnings. An inmate, however, is
 not, because of his incarceration,
 automatically in custody for the purposes of
 Miranda; rather, whether an inmate is in
 custody must be determined by considering
 his freedom to depart from the place of his
 interrogation.
 Factors which bear on the determination of whether
 an inmate is in custody for purposes of Miranda include:
 (1) whether the inmate was free to refuse to go to the place
 of the interrogation; (2) whether the inmate was told that
 participation in the interrogation was voluntary and that
 he was free to leave at any time; (3) whether the inmate
 was physically restrained from leaving the place of
 interrogation; and (4) whether the inmate was free to
 refuse to answer questions.

Id., 580 S.E.2d 415 (citations, quotation marks, and brackets omitted).

 This Court has followed this rule in State v. Briggs, 137 N.C. App. 125, 129,

526 S.E.2d 678, 680-81 (2000), and State v. Wright, 184 N.C. App. 464, 470-71, 646

S.E.2d 625, 629 (2007), cert. denied, 362 N.C. 372, 662 S.E.2d 393 (2008). In addition,

the Fourth Circuit Court of Appeals agrees:

 [Mathis v. United States, 391 U.S. 1, 20 L. Ed. 2d 381
 (1968),] clearly holds that the fact that a defendant is
 imprisoned on an unrelated matter does not necessarily

 - 11 -
 STATE V. HAMMONDS

 Opinion of the Court

remove the necessity for Miranda warnings. Nothing in
that opinion, however, suggests that an inmate is
automatically “in custody” and therefore entitled to
Miranda warnings, merely by virtue of his prisoner status.
...
 We also decline to read Mathis as compelling the use
of Miranda warnings prior to all prisoner interrogations
and hold that a prison inmate is not automatically always
in “custody” within the meaning of Miranda. [The
defendant’s] view of the Mathis decision would seriously
disrupt prison administration by requiring, as a prudential
measure, formal warnings prior to many of the myriad
informal conversations between inmates and prison guards
which may touch on past or future criminal activity and
which may yield potentially incriminating statements
useful at trial. As the Ninth Circuit pointed out, this
approach would “torture [Miranda] to the illogical position
of providing greater protection to a prisoner than to his
nonimprisoned counterpart.” [Cervantes v. Walker, 589
F.2d 424, 427 (9th Cir. 1978).] Such a result would be
directly at odds with established constitutional doctrine
that while persons in government-imposed confinement
retain various rights secured by the Bill of Rights, they
retain them in forms qualified by the exigencies of prison
administration and the special governmental interests that
result. See Wolff v. McDonnell, 418 U.S. 539, 94 S. Ct.
2963, 41 L. Ed. 2d 935 (1974) (qualified sixth amendment
rights of inmates in prison disciplinary proceedings); Bell
v. Wolfish, 441 U.S. 520, 99 S. Ct. 1861, 60 L. Ed. 2d 447
(1979) (qualified fifth amendment liberty interest of pre-
trial detainee); Hudson v. Palmer, [468 U.S. 517], 104 S.
Ct. 3194, 82 L. Ed. 2d 393 (1984) (qualified fourth
amendment right of inmates).
 ....
 Prisoner interrogation simply does not lend itself
easily to analysis under the traditional formulations of the
Miranda rule. A rational inmate will always accurately
perceive that his ultimate freedom of movement is
absolutely restrained and that he is never at liberty to
leave an interview conducted by prison or other

 - 12 -
 STATE V. HAMMONDS

 Opinion of the Court

 government officials. Evaluation of prisoner interrogations
 in traditional freedom-to-depart terms would be
 tantamount to a per se finding of “custody,” a result we
 refuse to read into the Mathis decision.

United States v. Conley, 779 F.2d 970, 972-73 (4th Cir. 1985), cert. denied, 479 U.S.

830, 93 L. Ed. 2d 61 (1986) (third alteration in original).

 A person who has been involuntarily committed is certainly a “person[] in

government-imposed confinement[,]” just as an incarcerated defendant, and the

exigencies of the administration of hospitals and inpatient facilities which treat

patients with psychiatric conditions are quite similar to those of prisons. See id. at

973. For example, if every involuntarily committed person held in an emergency

room, hospital, or other mental health treatment facility is automatically “in custody”

for purposes of Miranda, a law enforcement officer who simply needs to ask a patient

for information about an altercation or theft which had occurred in the facility would

have to first notify the person of his Miranda rights, regardless of the other

circumstances of the interview. Such a result is “directly at odds with established

constitutional doctrine that while persons in government-imposed confinement retain

various rights secured by the Bill of Rights, they retain them in forms qualified by

the exigencies of prison administration and the special governmental interests that

result.” See id. For these reasons, we hold that defendant was not automatically “in

custody” for purposes of Miranda based simply upon his involuntary commitment and

 - 13 -
 STATE V. HAMMONDS

 Opinion of the Court

instead we consider the circumstances of defendant’s statements in the same manner

as courts have considered interviews of incarcerated defendants.

 ii. Totality of the Circumstances

 In light of the above discussion, we must address whether the trial court’s

findings of fact support its conclusion of law that, based on the totality of the

circumstances, defendant was not “in custody” for purposes of Miranda. Generally,

“the appropriate inquiry in determining whether a defendant is ‘in custody’ for

purposes of Miranda is, based on the totality of the circumstances, whether there was

a formal arrest or restraint on freedom of movement of the degree associated with a

formal arrest.” Buchanan, 353 N.C. at 339, 543 S.E.2d at 828 (emphasis added and

quotation marks omitted). In the context of a hospitalized defendant, this Court

examines “(1) whether the defendant was free to go at his pleasure; (2) whether the

defendant was coherent in thought and speech, and not under the influence of drugs

or alcohol; and (3) whether officers intended to arrest the defendant.” State v. Allen,

200 N.C. App. 709, 714, 684 S.E.2d 526, 530 (2009). “This Court has also made a

distinction between questioning that is accusatory and that which is investigatory.”

Id., 684 S.E.2d at 530. In Allen, this Court held that the defendant was not “in

custody” and noted that “[a]ny restraint in movement [the] defendant may have

experienced at the hospital was due to his medical treatment and not the actions of

the police officers.” Id. at 715, 684 S.E.2d at 531.

 - 14 -
 STATE V. HAMMONDS

 Opinion of the Court

 In United States v. Jamison, the Fourth Circuit Court of Appeals also stressed

this distinction:

 Analysis of whether [the defendant] was in custody
 . . . depends on whether a reasonable person would have
 felt free to decline the officers’ requests or otherwise
 terminate the encounter[.] In dissecting the perceptions of
 such a reasonable person, however, we must be careful to
 separate the restrictions on his freedom arising from police
 interrogation and those incident to his background
 circumstances. That is, to the extent [the defendant] felt
 constrained by his injuries, the medical exigencies they
 created (e.g., the donning of a hospital gown and the
 insertion of an I.V. line), or the routine police investigation
 they initiated, such limitations on his freedom should not
 factor into our reasonable-person analysis. It is this careful
 differentiation between police-imposed restraint and
 circumstantial restraint that leads us to conclude that [the
 defendant] was not in custody[.]

U.S. v. Jamison, 509 F.3d 623, 629 (4th Cir. 2007) (citation, quotation marks, and

brackets omitted).

 In the context of a prison inmate, this Court examines “(1) whether the inmate

was free to refuse to go to the place of the interrogation; (2) whether the inmate was

told that participation in the interrogation was voluntary and that he was free to

leave at any time; (3) whether the inmate was physically restrained from leaving the

place of interrogation; and (4) whether the inmate was free to refuse to answer

questions.” Fisher, 158 N.C. App. at 145, 580 S.E.2d at 415 (quotation marks

omitted). In Conley, the Fourth Circuit Court of Appeals, in determining whether a

prison inmate was “in custody,” examined the “circumstances of the interrogation to

 - 15 -
 STATE V. HAMMONDS

 Opinion of the Court

determine whether the inmate was subject to more than the usual restraint on a

prisoner’s liberty to depart.” Conley, 779 F.2d at 973 (emphasis added).

 In addressing the issue of custody, we apply an objective test:

 Throughout the years, the United States Supreme
 Court has stressed that the initial determination of custody
 depends on the objective circumstances of the
 interrogation, not on the subjective views harbored by
 either the interrogating officers or the person being
 questioned. Unless they are communicated or otherwise
 manifested to the person being questioned, an officer’s
 evolving but unarticulated suspicions do not affect the
 objective circumstances of an interrogation or interview,
 and thus cannot affect the Miranda custody inquiry. Nor
 can an officer’s knowledge or beliefs bear upon the custody
 issue unless they are conveyed, by word or deed, to the
 individual being questioned. A policeman’s unarticulated
 plan has no bearing on the question whether a suspect was
 in custody at a particular time; the only relevant inquiry is
 how a reasonable man in the suspect’s position would have
 understood his situation.

Buchanan, 353 N.C. at 341-42, 543 S.E.2d at 829 (emphasis added and citations and

quotation marks omitted).

 Here, the trial court made Finding of Fact 13, as quoted above. During the

interview, the police officers told defendant that he was not being arrested and in fact

did not arrest him. The officers never told defendant that he could not stop the

conversation or that he could not request that they leave, and the officers never

threatened defendant or raised their voices. Defendant was “never isolated without

the ability to contact others[,]” a sitter watched the interview, and nurses were “in

 - 16 -
 STATE V. HAMMONDS

 Opinion of the Court

and out” during the interview. Given that the factors in Allen or Fisher do not

squarely apply to the context of an involuntarily committed defendant, we focus on

“how a reasonable man in [defendant’s] position would have understood his

situation.” See Buchanan, 353 N.C. at 341-42, 543 S.E.2d at 829. While the dissent

is correct that defendant was not free to leave the hospital, “we must be careful to

separate the restrictions on his freedom arising from police interrogation and those

incident to his background circumstances.” See Jamison, 509 F.3d at 629. In other

words, we must analyze how a reasonable person, in defendant’s position, would have

perceived the purpose of the restriction on his movement, whether it be for police

interrogation or for medical treatment.

 On 11 December 2012, the night before the police approached defendant,

defendant “tried to leave the room, but was escorted back by security.” Given the fact

that defendant’s attempt to escape took place before the police interview, coupled with

the attendant circumstances of the interview, as discussed above, we hold that a

reasonable person in defendant’s position would understand that the restriction on

his movement was due to his involuntary commitment to receive medical treatment,

not police interrogation. See Allen, 200 N.C. App. at 715, 684 S.E.2d at 531 (holding

that the defendant was not “in custody” and noting that “[a]ny restraint in movement

[the] defendant may have experienced at the hospital was due to his medical

treatment and not the actions of the police officers”). Additionally, the test in Conley

 - 17 -
 STATE V. HAMMONDS

 Opinion of the Court

accords with this result, as defendant was not subject to “more than the usual

restraint[.]” See Conley, 779 F.2d at 973.

 The dissent correctly cites N.C. Gen. Stat. § 122C-205(a), for the proposition

that if an involuntarily committed patient of a 24-hour facility escapes, the

responsible professional shall immediately notify law enforcement. See N.C. Gen.

Stat. § 122C-205(a) (2011). But a prison inmate who attempts to escape prison would

also be met with police resistance, and yet as discussed above, numerous courts have

held that a prison inmate is not automatically “in custody” for purposes of Miranda.

We hold that the purpose behind a defendant’s restraint is much more relevant than

the force that can potentially be summoned to thwart a breach of that restraint. In

light of Buchanan, Allen, Conley, and Jamison, we agree with the trial court that

defendant was not “in custody” for purposes of Miranda. The trial court properly

considered all of the factors to determine if defendant was in custody and did not err

in its conclusion of law that based on the totality of the circumstances, defendant was

not in custody at the time he was interviewed.

D. Voluntariness

 Defendant next challenges the trial court’s conclusion of law that his

statements during the police interview were voluntary. Under the United States

Constitution, the question is whether the totality of the circumstances demonstrates

that the statement was “the product of an essentially free and unconstrained choice

 - 18 -
 STATE V. HAMMONDS

 Opinion of the Court

by its maker[.]” Culombe v. Connecticut, 367 U.S. 568, 602, 6 L. Ed. 2d 1037, 1057

(1961); see also State v. Bordeaux, 207 N.C. App. 645, 647, 701 S.E.2d 272, 274 (2010).

In considering whether a statement was voluntary, the court must assess “the totality

of all the surrounding circumstances—both the characteristics of the accused and the

details of the interrogation.” Schneckloth v. Bustamonte, 412 U.S. 218, 226, 36 L. Ed.

2d 854, 862 (1973). We consider the following factors:

 whether defendant was in custody, whether he was
 deceived, whether his Miranda rights were honored,
 whether he was held incommunicado, the length of the
 interrogation, whether there were physical threats or
 shows of violence, whether promises were made to obtain
 the confession, the familiarity of the declarant with the
 criminal justice system, and the mental condition of the
 declarant.

Cortes-Serrano, 195 N.C. App. at 655, 673 S.E.2d at 763. “Admonitions by officers to

a suspect to tell the truth, standing alone, do not render a confession inadmissible. .

. . [To be improper, an] inducement of hope must promise relief from the criminal

charge to which the confession relates.” State v. McCullers, 341 N.C. 19, 27, 460

S.E.2d 163, 168 (1995). In State v. Smith, a police officer testified that he told the

defendant during an interrogation: “I couldn’t tell him what would happened [sic],

but it will be better for him when he came to court that he would tell—that we would

tell the [district attorney] and the judge that he told the truth about it.” 328 N.C. 99,

115, 400 S.E.2d 712, 720-21 (1991) (first alteration in original and brackets omitted).

Our Supreme Court held that this statement did not constitute an improper promise

 - 19 -
 STATE V. HAMMONDS

 Opinion of the Court

and that the defendant’s confession was voluntary. Id. at 115, 118, 400 S.E.2d 721-

22.

 As relevant to defendant’s argument regarding voluntariness, the trial court

found as follows:

 9. That Nurse [Kinsella] checked the defendant for
 fall risk, that he was alert; he was not confused, he was
 oriented, he had a quick “get up and go”, and he could
 respond quickly to moving out of the bed, and had no
 medications to make him confused at the time that she saw
 him.
 10. That he was actually discharged from the care
 of the emergency room at 21:00 hours on 12-12. That he
 had to be medically stable for such to occur. That he
 actually clothed himself to leave before he actually left.
 11. That when the nurse went off duty, she noted
 that the defendant’s vital signs were within normal limits,
 his behavior was calm, he had proper emotional support;
 she had gone over the coping skills with him, and they were
 effective. She had discussed his concerns and suicide
 precautions were still in place. Nurse [Kinsella] had been
 on duty approximately two hours when two detectives
 arrived from the Monroe Police Department. They checked
 with her before they went to the defendant’s room, and she
 told them that he was alert, oriented, and they were
 welcome to talk with him. She did not ask the defendant if
 he wished to speak with them, and did not tell the officers
 why the defendant was there, although it is clear from the
 conversation that they were aware that he was actually
 involuntarily committed at that time.
 ....
 13. The defendant was interviewed by Detective
 Williams of the Monroe Police Department and Detective
 T.J. Goforth at approximately five p.m. on December the
 12th. They spoke with the defendant for approximately one
 and [a] half hours. No Miranda Rights were given to the
 defendant. On at least three occasions, however, the

 - 20 -
 STATE V. HAMMONDS

 Opinion of the Court

defendant was told that, “there were no arrest warrants
with the officers,” and that they were not here to “lock you
up.” Indeed the defendant was not arrested and there were
no warrants present at the time they spoke with the
defendant. It is clear from the conversation that the
officers had with the defendant that they knew that he was
hospitalized as a result of an overdose, whether accidental
or intentional, and had been involuntarily committed, and
would be going for further evaluation and treatment. But
although the defendant’s words seem to be muttered,
especially initially, they were appropriate responses to the
statements or questions from the officers. The defendant
answered the questions or statements coherently and
appropriately. Throughout the conversation the defendant
never asked the officers to leave or to stop talking. There
was actually a sitter watching the interview, and nurses
were in and out. The defendant was never isolated without
the ability to contact others. The tone was conversational
between the officers and the defendant, although the
officers would confront the defendant when they believed
that he was being less than truthful. The officers did not
tell the defendant he was being taped. There is no
indication that there had been any previous relationship
between the defendant and the officers. The nurse was not
an agent of the state [or] government. The defendant was
not arrested and no warrant issued at the time. The
defendant was unable to leave the hospital. He was not
actually at a police station and was not told that he could
not stop the conversation or request that the officers leave.
He was never threatened, voices were never raised. The
only promises made were such that the officers would tell
the [district attorney] about his cooperation, and that he
would be in a superior position to others if he told, before
others did, as to the facts of the circumstances of the
incident at Wal-Mart.
 14. At the time of the interview the defendant had
had no drugs administered by the hospital in more than
fourteen hours. The Court has had a chance to review the
witnesses and listen to the tape, and finds the defendant to
be at all times coherent and understanding of the

 - 21 -
 STATE V. HAMMONDS

 Opinion of the Court

 questions, and appropriately responsive in his answers.
 There appears nothing from the Court listening to the tape
 that indicates the defendant was under the influence of any
 medication, and certainly not under the influence of
 medications that would cause him to be incapable of
 understanding the context or words that were coming to
 him and issued by him. The defendant was coherent in
 thought and speech and not under the influence of drugs or
 alcohol at the time the statement was made.

 The trial court concluded: “Based on the totality of the circumstances, the

Court finds the defendant made a knowing, voluntary, and understanding statement

to the officers[.]”

 The trial court’s findings of fact addressed the obvious concerns raised by the

evidence in this case. Defendant had been involuntarily committed and had

attempted a drug overdose. The trial court’s extensive findings of fact, only a portion

of which are quoted above, demonstrate that the court carefully considered all of the

circumstances and defendant’s mental and emotional state. In addition, there was

an audio recording of the interview, which the trial court reviewed and was able to

hear both the officers’ questions and defendant’s responses and demeanor. A trial

court, and this Court, should exercise a high degree of care to ensure that the rights

of a person in defendant’s condition, who has been involuntarily committed and may

suffer from an impairing mental or emotional condition, are protected. But the trial

court did exactly that in this case.

 - 22 -
 STATE V. HAMMONDS

 Opinion of the Court

 Defendant also contends that his confession was not voluntary because the

police officers made threats, promises, and accusations of lying. But we are bound by

the findings the trial court actually made, as they are either unchallenged or

supported by the evidence. See Phillips, 151 N.C. App. at 190-91, 565 S.E.2d at 701;

Jackson, 308 N.C. at 581, 304 S.E.2d at 152. The trial court found that “the officers

would confront the defendant when they believed that he was being less than

truthful.” The trial court also found that the police officers never threatened

defendant and promised only that they “would tell the [district attorney] about his

cooperation, and that he would be in a superior position to others if he told, before

others did, as to the facts of the circumstances of the incident at Wal-Mart.” The

police officers’ exhortations that defendant tell the truth did not render defendant’s

confession involuntary. See McCullers, 341 N.C. at 27, 460 S.E.2d at 168.

Additionally, the police officers’ promise that they would tell the district attorney

about defendant’s cooperation and that he would be in a “superior position to others”

was not improper and did not vitiate the voluntariness of defendant’s confession. See

id., 460 S.E.2d at 168; Smith, 328 N.C. at 115, 118, 400 S.E.2d at 721-22; State v.

Richardson, 316 N.C. 594, 603-04, 342 S.E.2d 823, 830-31 (1986) (holding that a

detective’s statement to the defendant that “the district attorney usually responds

favorably when a defendant cooperates” did not render the defendant’s confession

involuntary).

 - 23 -
 STATE V. HAMMONDS

 Opinion of the Court

 Defendant’s reliance on State v. Pruitt, where our Supreme Court held that the

defendant’s confession was involuntary, is misplaced. See 286 N.C. 442, 458, 212

S.E.2d 92, 102-03 (1975). There,

 the interrogation of defendant by three police officers took
 place in a police-dominated atmosphere. Against this
 background the officers repeatedly told defendant that
 they knew that he had committed the crime and that his
 story had too many holes in it; that he was “lying” and that
 they did not want to “fool around.” Under these
 circumstances one can infer that the language used by the
 officers tended to provoke fright. This language was then
 tempered by statements that the officers considered
 defendant the type of person “that such a thing would prey
 heavily upon” and that he would be “relieved to get it off
 his chest.” This somewhat flattering language was capped
 by the statement that “it would simply be harder on him if
 he didn’t go ahead and cooperate.” Certainly the latter
 statement would imply a suggestion of hope that things
 would be better for defendant if he would cooperate, i.e.,
 confess.

Id., 212 S.E.2d at 102. In contrast, here, the “tone was conversational between the

officers and the defendant, although the officers would confront the defendant when

they believed that he was being less than truthful.” Accordingly, we distinguish

Pruitt.

 Defendant’s reliance on State v. Flood, where this Court held that a police

officer made an improper promise, is similarly misplaced. See ___ N.C. App. ___, ____,

765 S.E.2d 65, 72 (2014), disc. review denied, ___ N.C. ___, 768 S.E.2d 854 (2015).

There,

 - 24 -
 STATE V. HAMMONDS

 Opinion of the Court

 [d]uring the interview, Agent Oaks suggested she would
 work with and help Defendant if he confessed and that she
 “would recommend that defendant get treatment” instead
 of jail time. She also asserted that Detective Schwab “can
 ask for, you know, leniency, give you this, do this. He can
 ask the District Attorney’s Office for certain things. It’s
 totally up to them what they do with that but they’re going
 to look for recommendations.” Agent Oaks further
 suggested to Defendant that
 if you admit to what happened here Detective
 Schwab is going to probably talk to the
 District Attorney and say, “hey, this is my
 recommendation. Hey, this guy was honest
 with us. This guy has done everything we’ve
 asked him to do. What can we do?” and talk
 about it.
 At one point, Agent Oaks asked Defendant directly: “Do
 you want my help?” Agent Oaks also threatened that any
 possibility of help from her or Detective Schwab would
 cease after their conversation with Defendant ended, once
 even after Defendant asked to speak to his mother on the
 phone.

Id. at ___, 765 S.E.2d at 72 (brackets and ellipses omitted). In contrast, here, the

police officers never threatened defendant and promised only that they “would tell

the [district attorney] about his cooperation, and that he would be in a superior

position to others if he told, before others did, as to the facts of the circumstances of

the incident at Wal-Mart.” Accordingly, we also distinguish Flood and hold that the

trial court’s findings of fact support its conclusion of law that defendant’s confession

was voluntary.1

 1 We also note that this Court in Flood held that the defendant’s confession was voluntary
despite its conclusion that Agent Oaks made an improper promise. Id. at ___, 765 S.E.2d at 74.

 - 25 -
 STATE V. HAMMONDS

 Opinion of the Court

 III. Restitution

 Defendant’s last argument is that the trial court erred in ordering defendant

to pay $50 in restitution because Ms. Gaddy did not testify regarding the value of her

identity card or medications, which defendant had stolen and had not been returned

to her. The State agrees with defendant but argues that the appropriate remedy is

to remand the case to the trial court for further consideration.

A. Standard of Review

 Although defendant failed to object to this issue, we hold that this issue is

preserved for appellate review. See N.C. Gen. Stat. § 15A-1446(d)(18) (2013); State v.

Mumford, 364 N.C. 394, 402-03, 699 S.E.2d 911, 917 (2010). “[W]e review de novo

whether the restitution order was supported by evidence adduced at trial or at

sentencing.” State v. Wright, 212 N.C. App. 640, 645, 711 S.E.2d 797, 801 (quotation

marks omitted), disc. review denied, 365 N.C. 351, 717 S.E.2d 743 (2011).

B. Analysis

 [T]he amount of restitution recommended by the trial court
 must be supported by evidence adduced at trial or at
 sentencing. . . .
 Prior case law reveals two general approaches: (1) when
 there is no evidence, documentary or testimonial, to
 support the award, the award will be vacated, and (2) when
 there is specific testimony or documentation to support the
 award, the award will not be disturbed.

State v. Moore, 365 N.C. 283, 285, 715 S.E.2d 847, 849 (2011). In Moore, our Supreme

Court articulated a third approach for cases that fall in the middle ground. Id. at

 - 26 -
 STATE V. HAMMONDS

 Opinion of the Court

285-86, 715 S.E.2d at 849-50. The Court held that “some evidence” supported an

award of restitution but that the evidence was not specific enough to support the

amount of the award. Id. at 286, 715 S.E.2d at 849. The Court remanded the case to

the trial court for a new hearing to determine the appropriate amount of restitution.

Id., 715 S.E.2d at 849-50. Because there is some evidence to support an award of

restitution but the evidence is not specific enough to support the amount of the award,

we vacate the restitution order and remand for a new hearing to determine the

appropriate amount of restitution. See id., 715 S.E.2d at 849-50.

 IV. Conclusion

 For the reasons noted above, we hold that the trial court committed no error

during the guilt-innocence phase, vacate the restitution order, and remand the case

for a new hearing to determine the appropriate amount of restitution.

 NO ERROR IN PART, VACATED IN PART, AND REMANDED.

 Judge MCCULLOUGH concurs.

 Judge INMAN dissents.

 - 27 -
 No. COA15-53 – State v. Hammonds

 INMAN, Judge, dissenting.

 I must respectfully dissent to the majority’s decision that defendant’s

statement to police was noncustodial because, in my view, the circumstances of a

person who has been involuntarily committed require inquiry and analysis beyond

that performed by the trial court here.

 The issue of whether and in what circumstances police questioning of an

involuntarily committed person is custodial is one of first impression in North

Carolina. While I agree with the majority that the nature of involuntary commitment

does not render police questioning custodial per se, the analysis employed by North

Carolina’s appellate courts in other settings does not address the circumstances of a

person who has been placed in custody involuntarily, who has not been charged with

any crime, and whose mental condition merits inpatient treatment. It is incumbent

upon trial courts in such cases to apply the factors identified by this Court and the

North Carolina Supreme Court in other settings and to consider additional factors

that are not at issue in other settings and have not previously been addressed by

these courts. The additional factors include whether the involuntarily committed

person expressly consented to the police interview and whether the person was told

he was free to exit the interview area or to ask the officers to leave his presence.

 I acknowledge that the trial court’s findings of fact with regard to a motion to

suppress are conclusive on appeal if supported by any competent evidence, and I

agree that defendant has not managed to refute the few findings he challenged based
 STATE V. HAMMONDS

 INMAN, J., dissenting.

on this standard of review. I disagree, however, with the majority’s review of the trial

court’s determination of whether defendant was in custody when he was questioned,

a conclusion of law fully reviewable on appeal. In my view, the trial court erred by

applying a legal analysis inconsistent with this Court’s precedent in other settings

and by failing to weigh other factors necessary to determine whether police

questioning of an involuntarily committed person was custodial.

 The facts here – many of them found by the trial court – demonstrate the

shortcomings in the analysis and conclusion that defendant was not in custody when

questioned. Defendant was confronted without warning by two police detectives in

the room where he was confined against his will. Neither the detectives nor any

medical provider asked defendant to consent to an interview. The detectives did not

introduce themselves to defendant at the beginning of the interview. Detective

Williams simply began questioning defendant about his condition and the

circumstances leading to his hospitalization. It appears from the evidence that

defendant had no place to retreat to if he wished to avoid questioning, although the

trial court made no finding in this regard. It is also unclear whether defendant was

free to leave his bed during police questioning; at the end of the interview Detective

Goforth offered to swap out an old tray of food from defendant’s bedside with a tray

elsewhere in the room, “and put the fresh one where you can reach it.” The trial court

made no finding in this regard.

 2
 STATE V. HAMMONDS

 INMAN, J., dissenting.

 The circumstances of an involuntarily committed person are not the same as

those of a typical hospital patient. In the hospital cases cited by the majority, the

defendant was in a medical facility on his own volition, not legally restrained in any

way. See, e.g., State v. Allen, 200 N.C. App. 709, 715, 684 S.E.2d 526, 531 (2009) (the

defendant was not in custody where his restraint of movement was due to medical

treatment for a cut); United States v. Jamison, 509 F.3d 623, 633 (4th Cir. 2007)

(“Absent police-imposed restraint, there is no custody.”).

 I also disagree with the majority that cases addressing questioning of prison

and jail inmates are so closely analogous as to obviate the need for additional inquiry

where the person subject to questioning has been involuntarily committed. Unlike

prison and jail inmates, who necessarily have been advised of their Miranda rights

in the course of their prior arrests, and who often have had the benefit of counsel in

the course of their criminal cases, involuntarily committed patients may have had no

prior occasion to be so advised or even to think about their rights if approached by

police.

 Involuntary commitment, as set out in our General Statutes, is a physical

detention executed by government actors against the will of an individual. The

General Assembly unequivocally describes involuntary commitment as the taking of

a person into “custody.” See N.C. Gen. Stat. § 122C-252 (2013) (describing facilities

to be utilized for “the custody and treatment of involuntary clients”); N.C. Gen. Stat.

 3
 STATE V. HAMMONDS

 INMAN, J., dissenting.

§ 122C-261 (2013) (specifying that the purpose of an involuntary commitment order

is “to take the respondent into custody for examination by a physician or eligible

psychologist”). Indeed, the order by which the Union County magistrate committed

defendant was titled “Custody Order.”

 The Custody Order served on defendant in this case specified that, after taking

defendant into custody, the law enforcement officer was required to inform him that

he “[was] not under arrest and has not committed a crime, but is being transported

to receive treatment and for his or her own safety and that of others.” The required

disclaimer belies the similarity between a formal arrest and the taking of an

individual into custody for the purposes of involuntary commitment, a comparison

this Court has recognized before. In In re Zollicoffer, we reasoned that:

 [T]he requirements for a custody order under N.C. Gen.
 Stat. § 122C-261 are analogous to those where a criminal
 suspect is subject to loss of liberty through the issuance of
 a warrant for arrest. In both instances a magistrate or
 other approved official must find probable cause (though
 under N.C. Gen. Stat. § 122C-261 the synonymous term
 reasonable grounds is used) supporting the issuance of the
 order or warrant. In both cases the magistrate has the
 power to deprive a person of his liberty pending a more
 thorough and demanding determination of the evidence
 against him.

165 N.C. App. 462, 466, 598 S.E.2d 696, 699 (2004); see also In re Moore, __ N.C. App.

__, 758 S.E.2d 33, 36 (2014) (“We have drawn [a comparison between involuntary

commitment and arrest] because a custody order deprives a person of their liberty

 4
 STATE V. HAMMONDS

 INMAN, J., dissenting.

and therefore is analogous to a criminal proceeding, like the issuance of an arrest

warrant, where a defendant is deprived of his liberty.”).

 The General Assembly also has recognized that both a formal arrest and

involuntary commitment feature substantial loss of liberty, because indigent persons

subject to either are constitutionally entitled to appointed counsel. See N.C. Gen.

Stat. § 7A-451(a)(1),(6) (2013); see also McBride v. McBride, 334 N.C. 124, 126, 431

S.E.2d 14, 16 (1993) (“[I]n determining whether due process requires the appointment

of counsel for an indigent litigant in a particular proceeding, a court must first focus

on the potential curtailment of the indigent’s personal liberty[.]”).

 Many of the findings entered by the trial court in this case reflect the similarity

between a formal arrest and an involuntary commitment custody order. The trial

court noted that Custody Order directed “any law enforcement officer” to take

defendant into custody and transport him to a 24-hour health facility. When

defendant tried to leave the hospital on the night of 11 December, he was escorted

back to his room by a uniformed security officer. The trial court found as an

uncontested fact that “[defendant] was unable to leave the hospital.” Any 24-hour

facility that accepts involuntarily committed clients is required to immediately notify

the appropriate law enforcement agency if any such patient leaves the premises, and

that law enforcement agency is in turn required to take the client into custody and

remit him to the 24-hour facility from which he “escaped.” See N.C. Gen. Stat. § 122C-

 5
 STATE V. HAMMONDS

 INMAN, J., dissenting.

205(a) (2013).

 Assuming arguendo that the cases involving police questioning of inmates,

relied upon by the majority, were sufficient to apply in this case, they do not support

the trial court’s conclusion in this case. This Court in State v. Fisher held that

“whether an inmate is in custody must be determined by considering his freedom to

depart from the place of his interrogation.” 158 N.C. App. 133, 145, 580 S.E.2d 405,

415 (2003) aff'd, 358 N.C. 215, 593 S.E.2d 583 (2004). In contrast, defendant was not

free to leave his hospital room.

 Fisher’s further holding, which is quoted by the majority and bears repeating,

requires the trial court to consider the following specific factors: “(1) whether the

[involuntarily committed person] was free to refuse to go to the place of the

interrogation; (2) whether the [person] was told that participation in the

interrogation was voluntary and that he was free to leave at any time; (3) whether

the [person] was physically restrained from leaving the place of interrogation; and (4)

whether the [person] was free to refuse to answer questions.” Id. (citations and

quotation marks omitted). The first two factors, applied to the trial court’s findings

in this case, suggest that defendant was in custody: he was not free to refuse to go to

the place of the interrogation and he was not told that his participation was voluntary

or that he was free to leave. The trial court’s findings do not reflect consideration of

the third and fourth factors.

 6
 STATE V. HAMMONDS

 INMAN, J., dissenting.

 Although the trial court found that defendant “was not told that he could not

stop the conversation or request that the officers leave,” the double negative reveals

an attenuated approach to the facts and misstates the second factor provided in

Fisher. It appears undisputed that the police detectives did not tell defendant that

he could stop the conversation or that he could ask the officers to leave.

 After entering defendant’s room and asking about his health condition,

detectives first asked defendant about thefts from lockers at his workplace, unrelated

to the charges and convictions on appeal here. After defendant denied any

involvement, the detectives told him that they were being “lenient” by coming to him

without an arrest warrant and that “unless you tell us the truth, then we have to do

what we have to do. . . . Because we already know. It’s just that we want to hear it

from you.” After demonstrating to defendant that he could not avoid culpability by

his denials because of their superior knowledge, police detectives then questioned

defendant about the robbery of Ms. Gaddy underlying the charges and convictions at

issue in this appeal. Detective Goforth repeated her forecast of the consequences

without his cooperation: “But the thing is is that, like I said, I mean, that man right

there [Detective Williams] needs a warrant. He’s already got everything he needs.

It’s a done deal.” The nature of the police detectives’ statements to defendant, no

matter how softly spoken or conversational in tone, and notwithstanding their

assurances that he would not be arrested there on the spot, would seem to suggest to

 7
 STATE V. HAMMONDS

 INMAN, J., dissenting.

any reasonable person that police already had enough information to bring charges

but were giving him a chance to cooperate in hopes of mitigating his exposure. In my

view, a reasonable person in defendant’s position presented with this information

from two police officers at his bedside would hardly consider the conversation an

informal one. The trial court’s findings of fact did not address these circumstances.

 Unlike the defendant in Fisher, defendant expressed no consent to speak with

police officers and in fact had no warning that they were coming to question him. The

officers simply asked the nurse monitoring defendant for permission to enter the

room, which she granted without seeking defendant’s consent. While the issue has

not previously been addressed in North Carolina, courts in other jurisdictions

considering police questioning involuntarily committed patients have noted such

factors as central to the custody analysis. Compare United States v. Hallford, No.

13–0335(RJL), 2015 WL 2128680, at *3 (D.D.C. May 6, 2015) (where defendant, who

was questioned in his hospital gown, was not asked if he would submit to an interview

and was never told he could refuse to answer questions or suspend the interview at

any time, “any reasonable person would have believed that he was not free to leave

or terminate the interview”) with State v. Rogers, 848 N.W.2d 257, 263-64 (N.D. 2014)

(“The medical staff did not permit the detectives to speak with Rogers until the staff

had his permission. Hospital staff also selected the room where the interview was

conducted [outside of the defendant’s hospital room].”).

 8
 STATE V. HAMMONDS

 INMAN, J., dissenting.

 Nor were the circumstances of defendant’s statements to police analogous to

the statements at issue in Fisher and decisions following its holding. The defendant

in Fisher was not sought out by police; he asked to leave his prison cell and met with

a guard to confess he had committed a murder years earlier because “he realized he

was getting away with murder and it started eating him up inside[.]” 158 N.C. App.

at 138, 580 S.E.2d at 410 (quotation marks and brackets omitted). The defendant in

State v. Briggs was exiting an interview room when he stopped at the open door,

closed the door, returned to sit with the officer and confessed to a crime. 137 N.C.

App. 125, 127, 526 S.E.2d 678, 679 (2000). The defendant in State v. Wright

unexpectedly told officers that he had participated in a fatal shooting, even though

one officer had expressly told defendant that the purpose of their meeting was not to

interrogate him, was only to advise him of the status of the case, and that “‘if I do ask

a question, do not answer.’” 184 N.C. App. 464, 471, 646 S.E.2d 625, 630 (2007).

 Defendant’s circumstances in this case – like those of most involuntarily

committed mental patients – also differed from the prison environment cited by the

majority, supra, in which federal courts have reasoned that requiring Miranda

warnings in all prisoner interrogations “would seriously disrupt prison

administration by requiring, as a prudential measure, formal warnings prior to many

of the myriad informal conversations between inmates and prison guards.” United

States v. Conley, 779 F.2d 970, 973 (4th Cir. 1985). A mental patient’s constitutional

 9
 STATE V. HAMMONDS

 INMAN, J., dissenting.

rights should not be “qualified by the exigencies of prison administration and the

special governmental interests that result.” Id.

 The trial court made no finding regarding whether there was a formal arrest

or restraint on defendant’s freedom of movement of the degree associated with a

formal arrest. Nor did the trial court make a finding regarding whether a reasonable

person in defendant’s circumstances would not have felt free to terminate the

interview or to ask the officers to leave his room.

 The fact noted by the majority that defendant was involuntarily committed

based on actions bearing no relation to the criminal activity that officers questioned

him about did not, in my view, diminish his constitutional rights with regard to

interrogation. Such an approach would leave involuntarily committed patients

vulnerable to visits from law enforcement officers seeking information they would be

less likely to obtain in another setting. Courts must not place such risk on a

population which by definition is comprised of people suspected of not being able to

care for themselves.

 It is important to note that the trial court may not have been presented with

the case law cited or the legal analysis included in this dissent. The extensive

findings of fact reflect that the trial court indeed exercised a high degree of care in its

decision. Nonetheless, in my view the decision was in error.

 In light of the additional factors which I believe must be weighed – whether

 10
 STATE V. HAMMONDS

 INMAN, J., dissenting.

defendant expressly consented to speak with police and whether defendant was told

that he could ask officers to leave his presence – along with other factors previously

delineated by this Court as necessary to determining whether a statement is

custodial, I would reverse the trial court’s order denying defendant’s motion to

suppress and remand this case for reconsideration of the motion and the entry of

findings and conclusions based upon all pertinent factors. Because one factor to be

considered in determining whether a statement was voluntary is whether defendant

was in custody when questioned, the trial court’s conclusion regarding custody also

could require it to reconsider the issue of whether defendant’s statement was

voluntary.

 11